```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
 2                          AT CLARKSBURG

 3   ----------------------------x
     UNITED STATES OF AMERICA,      :
 4                                  :
          Plaintiff,                :
 5                                  : CRIMINAL ACTION NUMBER:
       vs.                          : 1:24-CR-42
 6                                  :
     STEVEN DAVID SEEGER,           :
 7                                  :
          Defendant.                :
 8   ----------------------------x

 9        Proceedings had in the pretrial conference and motions
     hearing of the above-styled action on April 14, 2025, before
10   the Honorable Thomas S. Kleeh, Chief District Judge.

11     APPEARANCES:

12     FOR THE UNITED STATES OF AMERICA:

13        Kimberley D. Crockett, Esq.
          Daniel Lee Salem, Esq.
14        U.S. Attorney's Office
          217 W. King Street, Suite 400
15        Martinsburg, WV 25401
          kimberley.d.crockett@usdoj.gov
16        daniel.salem@usdoj.gov

17     FOR THE DEFENDANT:

18        Thomas G. Dyer, Esq.
          Dyer Law Offices
19        P.O. Box 1332
          Clarksburg, WV 26302-1332
20        dyerlawof@aol.com

21        Martin P. Sheehan, Esq.
          Sheehan & Associates, PLLC
22        1140 Main Street, Suite 333
          Wheeling, WV 26003
23        martin@msheehanlaw.net

24     The Defendant was present in person.

25     Proceedings recorded by mechanical stenography.
       Transcript produced by computer-aided transcription.
```

1                       W I T N E S S E S

2                                                              PAGE

3   **KEITH LEE**

4   Direct Examination by Ms. Crockett                           5

5   Cross-Examination by Mr. Sheehan                            15

6   Redirect Examination by Ms. Crockett                        17

7   **THUNDER NICHOLSON**

8   Direct Examination by Ms. Crockett                          20

9   Cross-Examination by Mr. Dyer                               54

10  Redirect Examination by Ms. Crockett                        71

11  **JUDGE STEVEN L. SHAFFER**

12  Direct Examination by Ms. Crockett                          74

13  Cross-Examination by Mr. Sheehan                            80

14  Redirect Examination by Ms. Crockett                        84

15

16                      E X H I B I T S

17  IDENTIFICATION                                             PAGE

18  Government's Exhibit 1                                       35

19  Government's Exhibit 4                                       53

20  Government's Exhibit 5                                       45

21  Government's Exhibit 6                                       46

22  Government's Exhibit 7                                       48

23  Government's Exhibit 8                                       54

24  Government's Exhibit 9                                       51

25

1               Monday, April 14, 2025, 3:20 PM

2                            - - -

3          THE COURT:  Madam Clerk, would you be kind enough to

4    call our next case, please.

5          THE CLERK:  United States of America versus Steven

6    David Seeger, Criminal Action Number 1:24-CR-42.  Mr. Seeger is

7    present in person.

8       Will counsel please note your appearance.

9          MS. CROCKETT:  Kimberley Crockett and Dan Salem on

10   behalf of the Government.

11         MR. DYER:  Your Honor, Tom Dyer and Martin Sheehan on

12   behalf of the defendant.

13         THE COURT:  All right.  Good afternoon, counsel.  We

14   convene for final pretrial conference and motions hearing.

15      Let me ask this question as an initial matter.  Any

16   obstacles to proceeding as scheduled for trial next week, the

17   22nd, the Government has identified at this point?

18         MS. CROCKETT:  No, Your Honor.  The Government is

19   ready to go.

20         THE COURT:  Okay.  From defense?

21         MR. DYER:  Same here, Your Honor.

22         THE COURT:  All right.  I know we have a couple

23   motions.  I assume we could just dive in and go from there?

24   That work for everybody?

25         MS. CROCKETT:  Absolutely.

```
 1              THE COURT:  All right.  My understanding was,
 2   Ms. Crockett, the Government was going to call a couple
 3   witnesses.  Is that correct, or --
 4              MS. CROCKETT:  That is, Your Honor.
 5              THE COURT:  All right.  Go ahead.
 6              MS. CROCKETT:  Can I --
 7        Okay, Your Honor.  We're -- I assume we're going to take
 8   up the motion to suppress first, because that could be
 9   dispositive of the Kennedy motion.
10              THE COURT:  Yes.
11              MS. CROCKETT:  Okay.  Then I would call Keith Lee,
12   Your Honor.
13              THE COURT:  All right.  Good afternoon, sir.  Could I
14   ask you to make your way all the way to the front of the
15   courtroom?  Thank you.  When you get here, you're going to
16   pause with Madam Clerk so she can swear you in.  Then we'll ask
17   you to take the witness stand.  Thank you.
18              (KEITH LEE, GOVERNMENT'S WITNESS, SWORN)
19              THE CLERK:  Thank you.  If you'd please have a seat
20   here in the witness stand.
21              THE COURT:  Thank you, sir.  Once you're seated and
22   comfortable, if you wouldn't mind adjusting that mic just to
23   make sure everyone can hear you.  Thank you.
24        Ms. Crockett.
25              MS. CROCKETT:  Thank you, Your Honor.
```

*K. Lee - Direct Examination (Ms. Crockett)*

1                          DIRECT EXAMINATION

2    BY MS. CROCKETT:

3    Q.    If you can identify yourself for the record?

4    A.    My name is Keith Lee, and --

5    Q.    And -- oh, go ahead.

6    A.    -- I'm retired from the Nacogdoches, Texas, Police

7    Department.

8    Q.    Okay.  It looked like you were going to say more and I was

9    about to cut you off.

10   A.    Well, I -- let me state for the record my name is Leighton

11   Keith Lee.

12   Q.    Leighton Keith --

13   A.    Yes.

14   Q.    -- Lee.

15   A.    Yes, ma'am.

16   Q.    Okay.  Thank you.

17         And how are you employed right now?

18   A.    I am retired, happily.

19   Q.    You indicated that you worked for the Nacogdoches Police

20   Department.  How long did you work for them?

21   A.    I was there 20 years and one month.

22   Q.    And did that include the year of 2021?

23   A.    It did.

24   Q.    Okay.  And what rank did you retire as?

25   A.    I retired as a corporal.

*K. Lee - Direct Examination (Ms. Crockett)*

1  Q.    Okay.  In March of 2021, did you come into contact with an

2  individual --

3              MS. CROCKETT:  Before I proceed, Your Honor, just one

4  preliminary issue.

5              THE COURT:  Yes, ma'am.

6              MS. CROCKETT:  And we didn't discuss this, and I

7  should have brought it up before I began questioning.

8        In the indictment in this case, we allege violations of

9  law against a Jane Doe 1 and a Jane Doe 2.

10             THE COURT:  Right.

11             MS. CROCKETT:  In all of our pleadings, we try to

12  reference them still as Jane Doe 1 and 2.  I know defense filed

13  a few pleadings with their names included.  For the record

14  today and for trial, I think we probably should address how the

15  Court will permit us to refer to them at trial.  If we're going

16  to use, like, initials; if we're going to stick with Jane Doe 1

17  and 2.

18             THE COURT:  Let's go with initials, assuming Jane

19  Doe 1 and Jane Doe 2 have different and distinguishable

20  initials.

21             MS. CROCKETT:  They do.

22             THE COURT:  Okay.  All right.

23             MS. CROCKETT:  Okay.

24             THE COURT:  What are Jane Doe 1's -- if that's

25  right -- initials here?

*K. Lee - Direct Examination (Ms. Crockett)*

1      MS. CROCKETT:  Jane Doe 1 is alleged in Count One and

2 Two of the indictment.

3      THE COURT:  Right.

4      MS. CROCKETT:  And her initials are P.G.

5      THE COURT:  Okay.  And Jane Doe 2?

6      MS. CROCKETT:  K.S.

7      THE COURT:  And which counts is Jane Doe 2 covered

8 by?

9      MS. CROCKETT:  Three and Four.

10   And Your Honor, Count Five is a general possession count,

11 and they are both incorporated within Count Five.

12      THE COURT:  Okay.

13      MS. CROCKETT:  All right.

14      THE COURT:  Understood.

15   Mr. Sheehan and Mr. Dyer, you got that straight?

16      MR. SHEEHAN:  I'm fine with that, Judge.  I do have

17 an objection I want to make at this time.

18      THE COURT:  Yes.

19      MR. SHEEHAN:  Your Honor, if the Government is going

20 to rely on good faith -- and they are certainly entitled to try

21 and offer that evidence -- a large amount of testimony is

22 admissible.  If they're not allowed to get to good faith, then

23 evidence will not be admissible.

24   You won't know that until we get further down the road.

25 So I wanted to make sure the objection was clear, and I'll just

*K. Lee - Direct Examination (Ms. Crockett)*

1  leave it at that and assume I've made it across the board for

2  the case.

3           THE COURT:  Yes.  Understood.

4           MR. SHEEHAN:  And sequestration --

5           THE COURT:  Oh, I'm sorry.  Go ahead.

6           MR. SHEEHAN:  Yeah.  And I'd like to sequester any

7  other witness.  I know the FBI agent is going to be here, but

8  the other witnesses I'd like to sequester during this

9  testimony.

10           THE COURT:  Okay.

11           MS. CROCKETT:  The only other witness we have in the

12  room is Thunder Nicholson with the West Virginia State Police.

13           THE COURT:  Okay.  Sir, could I ask you to step out

14  and wait in the hallway for me, please.

15           TROOPER NICHOLSON:  Yes, sir.

16           THE COURT:  We'll holler at you when we're ready.

17  Thank you so very much.

18           MS. CROCKETT:  Thank you, Your Honor.

19           THE COURT:  Motion to sequester granted.

20      General continuing -- whatever adjective we want to put on

21  that -- objection, Mr. Sheehan, noted.  We don't have a jury,

22  obviously.  It's an evidentiary hearing.  I think it important

23  the Court to have a full and robust record from which to make

24  decisions, and our ruling will indicate what evidence is

25  considered and not based on the appropriate standards.  I know

*K. Lee - Direct Examination (Ms. Crockett)*

1  we've got a couple different issues to work through.

2      Go ahead, Ms. Crockett.

3          MR. SHEEHAN:  Thank you, sir.

4          MS. CROCKETT:  Thank you, Your Honor.

5  BY MS. CROCKETT:

6  Q.   Mr. Lee, in March of 2021, did you come in contact with an

7  individual whose initials were K.S.?

8  A.   I did.

9  Q.   And how did that come about?

10 A.   She came into our police department lobby wanting to lodge

11 a complaint for improper disclosure of photographs.

12 Q.   Okay.  And I failed to ask you.  What were your duties

13 with the Nacogdoches Police Department?

14 A.   At the time the report was taken, I was the lobby officer.

15 I'd worked in the station.  Any report -- anybody that came in

16 and needed to speak to a police officer spoke to me.

17 Q.   Okay.  And did you have any other duties?

18 A.   I was -- I was also the sex offender registration officer

19 for the City of Nacogdoches.

20 Q.   Okay.  Okay.  So you indicated that she came into the

21 lobby to file a complaint.  Do you know when that occurred?

22 A.   I believe that was March 22nd of 2021.

23 Q.   Okay.  And what was her initial complaint when she came

24 in?

25 A.   Initially she came in and she told me that she had been in

*K. Lee - Direct Examination (Ms. Crockett)*

1  an online relationship with an older gentleman since she was

2  14 years old, and he had recently sent some rather what she

3  considered explicit photographs to her boyfriend and had

4  threatened to send them to her family and college professors.

5  Q.   Okay.  And did she describe for you what she meant by

6  sensitive?  I can't remember what the adjective was that you

7  just used.

8  A.   Yeah.  She -- she made it seem that it was nude

9  photographs.  I think it was explicit photographs from the

10 waist up.  I do not believe it was full frontal nudity, but I

11 believe she was nude from the waist up.

12 Q.   Okay.  And when she came in and made that complaint, did

13 she indicate whether or not she was a minor at the time the

14 images were taken or whether she was an adult at the time?

15 A.   She told me that they -- that no pictures had been

16 transmitted while she was a minor; that they had all taken

17 place after she'd turned 18.

18 Q.   Okay.  Did you take any action to notify law enforcement

19 in West Virginia of the complaint that you had taken?

20 A.   Not at that point.

21 Q.   Okay.  What did you do next?

22 A.   At that point I -- later in the day I wrote the report,

23 and then I contacted Mr. Seeger to let him know -- one of the

24 things she told me in the initial complaint was that he didn't

25 believe -- he wouldn't stop because he didn't believe there was

*K. Lee - Direct Examination (Ms. Crockett)*

1    anything we could do to him in Nacogdoches, Texas.  So I called

2    him to issue him a warning to stop sending these photographs.

3    And I told him that in the state of Texas it was a felony

4    offense and we would get a warrant and we would extradite him.

5    Q.    Okay.  So after speaking with Mr. Seeger, did you then

6    notify West Virginia authorities about the complaint?

7    A.    I do not believe I ever notified them.

8    Q.    Okay.  Do you know how West Virginia became aware of the

9    complaint?

10   A.    I do not.

11   Q.    Okay.

12   A.    I received a phone call from Trooper Nicholson.

13   Q.    Okay.  You received a phone call from Trooper Nicholson?

14   A.    Yes.  A few days later.

15   Q.    Okay.  Do you know what the date was?

16   A.    It was before the 29th.  So it may have been the 25th,

17   22nd, 23rd.  I'm not sure.

18   Q.    Okay.  And did you discuss with him the complaint that

19   K.S. made to you when she came into the lobby?

20   A.    I did.

21   Q.    Okay.  What did you report to Trooper Nicholson?

22   A.    I explained to him I'd been taking these reports for a

23   long time and been dealing with the public for a long time and

24   I did not feel like she was being totally truthful with me that

25   first day she came in.  That's the reason -- in my report, she

*K. Lee - Direct Examination (Ms. Crockett)*

1   told me it all took place after 18.  And I asked her again, did

2   anything happen before the age of 18?  Because I had my doubts,

3   but --

4   Q.   Okay.  And you jumped right in with your doubts with

5   Mr. Nicholson?  Or did you start by telling him what the nature

6   of the complaint was?

7   A.   I told him what the nature of the complaint was.

8   Q.   Okay.

9   A.   I don't have any record of what me and Mr. Nicholson spoke

10  about.

11  Q.   Okay.

12  A.   I think he reported that.

13  Q.   Okay.  Do you recall whether or not you provided him any

14  instances of inconsistencies that she would have shared with

15  you?  Or was this just your intuition?

16  A.   It was -- it was more intuition than anything.  I do not

17  remember sharing any inaccuracies with her.

18  Q.   Okay.  Did you have any further contact with K.S. after

19  her initial report?

20  A.   I did.  Approximately a week later, on the 29th, she

21  came back in and reported to me that all this began when she

22  was 14 years old.  And she lied to him initially about her age,

23  and he'd told her that her punishment for lying was to send him

24  a fully frontal nude photograph of herself.  And she did.

25  Q.   Okay.

*K. Lee - Direct Examination (Ms. Crockett)*

1  A.    And then over the next -- I think she said until she was

2  17 they contacted almost daily, spoke almost daily, and he had

3  her perform explicit sex acts on camera and send them, videos

4  and stills, to him.

5  Q.    When she came back in to report this to you, did you --

6  were you surprised by her appearance?

7  A.    No, ma'am.

8  Q.    And why is that?

9  A.    Because I fully expec- -- I've never known a

10  relationship -- online relationship between an older man and a

11  14-year-old juvenile to be totally platonic for four years and

12  then, all of a sudden, become graphic and sending nude

13  photographs back and forth.

14  Q.    And that would have been at the time that K.S. turned 18.

15  A.    Yes.

16  Q.    Okay.  So if I understand your testimony, she came in

17  earlier -- or the 22nd, I believe you said --

18  A.    Uh-huh.

19  Q.    -- of March of 2021.

20  A.    Correct.

21  Q.    And she made reports about Mr. Seeger providing images of

22  her to third parties.  But she reported to you that those

23  images were all photos taken of her as an adult.

24  A.    Correct.

25  Q.    Okay.

*K. Lee - Direct Examination (Ms. Crockett)*

1   A.   And I might add:  In the second report, she said one of

2   the reasons she was still sending him pictures is because he

3   had threatened to expose her to everybody if she did not

4   continue to send the pictures.  And that's the reason these

5   pictures that she was able to provide to the Nacogdoches Police

6   Department were recent photographs, since she was 18.

7   Q.   Okay.  Following her return to your office, did the

8   Nacogdoches Police Department do anything to advance that

9   investigation further?

10  A.   I am not sure.  Once I take their initial report, it is

11  handed off to detectives.  And Detective Ball was working that

12  case.

13  Q.   Okay.  So this case was handed off to another --

14  A.   Correct.  It was.

15  Q.   -- officer.

16  A.   It was.

17  Q.   Okay.

18        MS. CROCKETT:  I think that's all I have, Your Honor,

19  if you could just give me a quick second.

20        THE COURT:  Understood.

21     Any cross, counsel?

22        MR. SHEEHAN:  Yes, Your Honor.

23     I'm sorry, Your Honor.  I've fallen, and I'm in recovery.

24

25

*K. Lee - Cross-Examination (Mr. Sheehan)*

1                           CROSS-EXAMINATION

2  BY MR. SHEEHAN:

3  Q.   Did you bring your reports with you today?

4  A.   I think the prosecutor has the reports.  And I was able to

5  review the reports from them.

6  Q.   Okay.  You said that, ultimately, the police department

7  did obtain some photos of the girl?

8  A.   I -- that is my recollection, that they are attached to

9  that report.

10 Q.   And those photos of her are after she would have achieved

11 the age of 18.

12 A.   Yes, sir.

13 Q.   Okay.  When you reported to Trooper Nicholson your

14 intuition that she wasn't telling the whole truth, do you

15 remember anything specific about that?

16 A.   I -- I do not other than general cop talk about what I

17 suspected.  Because I told him exactly what I felt like had

18 probably taken place.

19 Q.   Have you had an opportunity to review Trooper Nicholson's

20 report at any time prior to your testimony today?

21 A.   I have not, sir.

22 Q.   Okay.  Do you recall if you told him if she recanted in

23 any way?

24 A.   I do not remember telling him that.

25 Q.   So it's always a terrible question.  I'm going to explore

*K. Lee - Cross-Examination (Mr. Sheehan)*

1  your answer a little.  Are you saying you didn't say "recant"?

2  Or you don't remember if you said "recant"?

3  A.    I do not remember.

4  Q.    Okay.

5  A.    Like I said, I did not document any of our conversation,

6  because he was not part of my reporting.

7  Q.    Okay.  Do you know when the last time was -- so he called

8  you.  You had a conversation.

9  A.    Uh-huh.

10  Q.    Now, you've put that the 25th-ish.

11  A.    Yes.

12  Q.    Somewhere in there.

13  A.    Sometime before the 29th.

14  Q.    Did you have another conversation with him at any time?

15  A.    Not that I remember.

16  Q.    So you would not have had any opportunity to update him

17  and say she came in and she's changed her story to say some of

18  the pictures were when she was a minor?

19  A.    I do not remember ever doing that.  Detective Ball, who

20  was working the case, could have.  I can't speak to what he

21  might have spoken to Mr. Nicholson about.

22  Q.    Okay.  And you talked originally about nude explicit

23  photos.

24        I see you nodding yes.

25  A.    Oh.  Yes, sir.

*K. Lee - Redirect Examination (Ms. Crockett)*

1    Q.    Okay.  And would those -- did you understand the context

2    of the explanation of nude explicit photos to be when she was

3    an adult or when she was a minor?

4    A.    The pictures she told me about the first day was as an

5    adult.

6    Q.    Okay.  Thank you, sir.

7              THE COURT:  Any redirect, counsel?

8              MS. CROCKETT:  Just one follow-up, Your Honor.

9                        REDIRECT EXAMINATION

10   BY MS. CROCKETT:

11   Q.    Mr. Lee, in your experience as a law enforcement

12   officer -- and I probably didn't ask.  How long were you a

13   police officer?

14   A.    Twenty years.

15   Q.    Okay.  In your experience with the Nacogdoches Police

16   Department for 20 years and your interaction with individuals

17   alleged to be victims of sexual misconduct, have you had an

18   experience or is it common for them to supplement a report or

19   provide additional details over time?

20   A.    It is very common.

21             MS. CROCKETT:  Okay.  That's all I have, Your Honor.

22             THE COURT:  Understood.

23        Any recross?

24             MR. SHEEHAN:  No redirect, Your Honor.

25             THE COURT:  All right.

```
 1              MS. CROCKETT:  That's all I have.

 2              THE COURT:  May this gentleman be excused?

 3              MS. CROCKETT:  Your Honor, he can be excused as it

 4  relates to this motion.  But I think he might be a witness for

 5  Mr. Salem as well.  There are some areas I didn't cover with

 6  him.

 7              THE COURT:  Okay.  Sir, you can go ahead and step

 8  down for now.

 9              THE WITNESS:  Thank you, sir.

10              THE COURT:  Thank you for making the trip from Texas.

11              MS. CROCKETT:  And I'm sorry, Your Honor.

12      But you've been sequestered.  So you'll have to sit down

13  in the hallway.

14              THE WITNESS:  That is fine.  That is fine.

15              MS. CROCKETT:  Thank you, Your Honor.  I'd call

16  Thunder Nicholson.

17              THE COURT:  Okay.  If you wouldn't mind hollering --

18      Sir, if I could trouble you to holler at Mr. Nicholson,

19  please.

20              THE WITNESS:  I will.  No problem.

21              THE COURT:  Thank you.

22              MS. CROCKETT:  Thank you.

23              THE COURT:  Thank you, sir.

24              MS. CROCKETT:  Your Honor, I didn't --

25      Oh, go ahead.  Sorry.
```

1          THE COURT:  You can make your way all the way to the

2     front, sir.  Madam Clerk will swear you in.  Then you can take

3     the witness stand.

4        I'm sorry, Ms. Crockett.

5          MS. CROCKETT:  Oh.  I'll wait.

6          (THUNDER NICHOLSON, GOVERNMENT'S WITNESS, SWORN)

7          THE CLERK:  Thank you.  If you'd please have a seat

8     here in the witness stand.

9          THE COURT:  Yes, Ms. Crockett.

10          MS. CROCKETT:  Your Honor, we didn't discuss this

11     beforehand.  I know that when we filed the motions and we filed

12     the response, the Court had at its -- for its consideration

13     many exhibits in this case.

14          THE COURT:  Uh-huh.

15          MS. CROCKETT:  I assume the Court has reviewed the

16     exhibits, including body cam footage, things that I -- I

17     don't --

18          THE COURT:  I have not watched the body cam footage.

19          MS. CROCKETT:  Okay.

20          THE COURT:  But we have it.

21          MS. CROCKETT:  Okay.

22          THE COURT:  And we don't need to play it today.

23          MS. CROCKETT:  Well, that was what I was going to ask

24     the Court.  I mean, I -- it's a two-minute segment for Trooper

25     Nicholson, if that would help the Court.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1    THE COURT:  If it -- if it's helpful and you think

2    the record of the -- of Trooper Nicholson explaining it, go

3    ahead.

4    MS. CROCKETT:  Okay.  All right.  Thank you.  I

5    appreciate that, Your Honor.

6    THE COURT:  Uh-huh.

7    <u>DIRECT EXAMINATION</u>

8    BY MS. CROCKETT:

9    Q.   If you would state your full name for the record.

10   A.   Thunder Nicholson.

11   Q.   And how you're employed.

12   A.   I'm employed with the West Virginia State Police,

13   currently out of the Grafton detachment.

14   Q.   Okay.  And before working in the Grafton detachment, were

15   you assigned to any other areas?

16   A.   I was assigned to the Kingwood detachment.

17   Q.   Okay.  And what is your role with the West Virginia State

18   Police?

19   A.   Investigate violations of West Virginia criminal and

20   traffic law.

21   Q.   Okay.  And are you responsible for investigating any

22   specific type of crimes or just general calls that come into

23   the office?

24   A.   General calls that come to the office.

25   Q.   Okay.  So you're not also assigned to, like, the Internet

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  Crimes Against Children unit.  You just -- you just investigate

2  general crime.

3  A.    Yes, ma'am.

4  Q.    Okay.  That having been said, even though you're not on

5  the ICAC unit, do you also investigate allegations of sexual

6  abuse or sexual misconduct?

7  A.    Yes, ma'am.

8  Q.    Okay.  How big is your department?

9  A.    The current department standings I believe is about 500

10 active troopers.

11 Q.    In your detachment.

12 A.    My current detachment is three-man strong.

13 Q.    Three-man strong.

14 A.    In Grafton, yes, ma'am.

15 Q.    Okay.  And when you were in Preston County, how long --

16 how large was your department there?

17 A.    I believe about eight.

18 Q.    Okay.  And how long have you been a law enforcement

19 officer?

20 A.    A little over six years at this point, ma'am.

21 Q.    Okay.  And all of that time, then, has been with the West

22 Virginia State Police?

23 A.    Yes, ma'am.

24 Q.    All right.  Are you familiar with the defendant in this

25 case, Steven David Seeger?

*T. Nicholson - Direct Examination (Ms. Crockett)*

1   A.    Yes, ma'am.

2   Q.    How are you familiar with him?

3   A.    I had cause to investigate him in 2021.

4   Q.    All right.  And in 2021, then, you would have been with

5   the West Virginia State Police for, like, two years.  Two years

6   and two months, maybe?

7   A.    Roughly.  Yes, ma'am.

8   Q.    How did he come to your attention?

9   A.    I received a complaint out of the -- our Fairmont office

10  from a Professor Jeffrey Roth from Stephen A. -- Stephen F.

11  Austin University in Texas about one of his students being what

12  is commonly referred to as "revenge porn" with blackmail.

13  Q.    Okay.  Did he provide you any specific details?

14  A.    He had advised me that he had a student, K.S., that had

15  been the subject of an email he received from Mr. Seeger

16  involving inappropriate relationships -- at least what was

17  perceived as inappropriate relationships in Mr. Seeger's eyes

18  with older gentlemen and taking money from them.

19  Q.    Okay.  And did he indicate to you whether or not K.S. was

20  a minor or an adult at the time of this claim of blackmail or

21  revenge porn?

22  A.    He advised that he was -- she was one of his students and

23  an adult at that point.

24  Q.    Okay.  Who provided you with the contact information,

25  then, for Jeffrey Roth?  He did?  Or you received that from

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  someone else?

2  A.    Mr. Roth had called into the Fairmont detachment.

3  Q.    Okay.

4  A.    Probably basing it upon one of our colored maps and

5  presumed that the Fairmont map covered the entirety of the

6  northern area of West Virginia.  And it's --

7  Q.    And so the --

8  A.    -- disseminated.

9  Q.    I'm sorry.

10       So the case was referred to you from the Fairmont --

11  A.    From a trooper at the Fairmont office.  Yes, ma'am.

12  Q.    Okay.  And what action did you take to follow up on

13  Professor Roth's email or call?

14  A.    I had requested contact information for K.S.  Between that

15  point and then a couple days later, I had received notification

16  a Corporal Lee out of Nacogdoches Police Department wanted to

17  speak to me.  And when I returned to work after my days off, I

18  gave him a call.

19  Q.    Okay.  All right.  When you gave Corporal Lee a call, what

20  did he report to you?

21  A.    He would report to me effectively what I had learned from

22  Mr. -- or from Dr. Roth about a potential revenge porn thing --

23  or as West Virginia refers to it, the nonconsensual disclosure

24  of intimate images -- situation going on with K.S.; that he had

25  spoken with K.S. and received some details about pictures being

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  sent to Mr. Roth and I think some family/friends, and something

2  was mentioned about K.S.'s father as well, and sending some

3  images.

4       After a brief discussion about it, Corporal Lee had

5  advised me, in Texas, the same crime is a felony, whereas here

6  in West Virginia it is just a misdemeanor.  Mr. -- or sorry.

7  Corporal Lee also advised that, based on his experience, he

8  felt as though there was more to the story than what K.S. was

9  kind of giving him at first.  And I believe he was able to

10  provide me with some contact information with K.S.

11  Q.   Okay.  Regarding the "more to the story" you just

12  referenced, did he provide you any examples of what he meant by

13  there being more to the story?

14  A.   He had just advised with his experience and, like, the

15  field that he focused on, which was sexual stuff, that after,

16  like, reading her body language and stuff that maybe she wasn't

17  being completely honest with maybe when some of the pictures

18  were sent and when their relationship originally started.

19  Q.   Okay.  I'll cut right to it.  Did he suggest to you that

20  maybe he thought she had sent pictures to Mr. Seeger when she

21  was a minor and was not disclosing that?

22  A.   Yes, ma'am.

23  Q.   Okay.  Did he provide you -- after reviewing your complete

24  narrative and police report, Trooper Nicholson, you reference

25  K.S. provided him, quote, "mix of information," or there was

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  reference to recanting.

2      Do you have any examples or can you draw today on what

3  he -- you would have referenced when you said a mix of

4  information?

5  A.    I believe when Corporal Lee was speaking to me on the

6  phone that the mix of information came that she would say one

7  thing to him and then kind of, like, when he would revisit the

8  question, just in kind of, like, a typical interviewing

9  scenario, like, her answer would be slightly different or she'd

10  give, like, a slightly more flustered answer just in terms of,

11  like, when they started talking and, like, when they stopped

12  talking and maybe when some of the pictures were sent.

13  Q.    Okay.  So this is -- the mix of information would have

14  been relative to her age and when images were sent.  Is that

15  my -- is that your understanding?

16  A.    Yes, ma'am.

17  Q.    Okay.  Was the information that was provided to you by

18  Corporal Lee included in your PC statement in your affidavit

19  for complaint for search warrant?

20  A.    No, ma'am, it was not.

21  Q.    Okay.  And who was the source of the information that you

22  included in your PC statement?

23  A.    K.S.

24  Q.    Okay.  When did you talk with K.S.?

25  A.    I believe it was a -- I had spoken to Corporal Lee, I

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  believe, on a Friday, and I think I finally got ahold of

2  Kaitlin on a Monday.

3  Q.    Okay.

4  A.    So the following Monday.

5  Q.    Okay.  Would that have been on the same date that you got

6  the search warrant?

7  A.    Yes, ma'am.

8  Q.    Okay.  So would that be March 29th of 2021?

9  A.    Yes, ma'am.

10 Q.    Okay.  And what did she tell you when you spoke with her?

11 A.    When I spoke to her, K.S. gave me a bit more information

12 about the relationship that she had with Mr. Seeger.  She had

13 advised me that the relationship had started when she was

14 approximately 14 years old, but she was not honest with

15 Mr. Seeger in regards to her age.  She did not disclose what

16 age she had alluded to be to Mr. Seeger to me during this phone

17 call.

18     She advised me that once she had revealed to Mr. Seeger

19 what her actual age was, as a form of punishment he had started

20 requesting sexually explicit photos, that eventually migrated

21 into videos, and that this relationship had gone on for several

22 years before kind of it was -- like, it ended, and then it was

23 kind of kicked back up again a few years later once she was an

24 adult.

25 Q.    Okay.  Did she also discuss with you the report that she

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  had made to Nacogdoches Police Department in Texas?

2  A.    She had referenced it a little bit.

3  Q.    Okay.  After speaking with Professor Roth, K.S., and

4  Corporal Lee, what did you do?  How did you advance the

5  investigation forward?  What decision did you make?

6  A.    I ran the investigation by my detachment commander, who is

7  now retired, Sergeant John Wyatt.  He's the one that directed

8  me in that I should get a search warrant for Mr. Seeger's

9  residence through circuit court, since it is a court of record.

10  And he provided me with a template that he had used in the past

11  for the affidavit and complaint of search warrant.

12  Q.    Okay.  Was -- had you ever applied for a search warrant in

13  circuit court before this case?

14  A.    No, ma'am.

15  Q.    Okay.  Had you ever applied for a search warrant in

16  magistrate court before this case?

17  A.    Several times, ma'am.

18  Q.    Can you give us an estimate?  Roughly, in that two and a

19  half years, how many search warrants do you think you had

20  applied for?

21  A.    I'd probably say about two dozen.

22  Q.    Okay.  When you applied for the search warrants before

23  this in magistrate court, can you tell me what your process

24  was?

25  A.    We had a template that was provided to us by the

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  Magistrate Court of West Virginia that's on a PDF.  So you'd go

2  in, you'd fill out page 1.  Page 2 would auto-populate with

3  everything that you put on page 1.  But we were only required

4  to sign page 1.

5      So we'd fill it out.  If you needed to add stuff on a

6  continuation sheet, you could, if, like, your narrative and

7  your desire for probable cause was more long-winded than the

8  four lines allowed.  We would print that out, sign it, take it

9  to magistrate court.

10 Q.  And then once you got to magistrate court, what -- how --

11 how did you present the search warrant?

12 A.  Typically, you take it up to the magistrate window,

13 whichever magistrate is not busy and/or in the desire to look

14 at your search warrant at the time.  We'll come up.  They'll

15 swear you to it, and they'll read it over.  If they think it's

16 good, they'll sign it and go make you -- like, get the copies

17 made with one of their secretaries.  If they have issues or

18 questions about it, they'll ask you more questions.  And if

19 it's something that they feel like isn't worth it, then they

20 won't sign it.

21 Q.  Okay.  If they review it and they find that you have

22 probable cause --

23     First of all, do they swear you in before you -- when you

24 appear in front of a magistrate?

25 A.  Yes, ma'am.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  Q.   Okay.  And do they affirm that the information that's

2  contained within the affidavit is true and accurate?

3  A.   Yes, ma'am.

4  Q.   Okay.  And once they've reviewed it, if there's a

5  determination of probable cause, do you then sign it?  Or do

6  you sign it before that determination is made?

7  A.   It's typically my practice to sign it beforehand.  That's

8  how I was trained, to sign it and then hand it to the judge --

9  Q.   Okay.

10  A.   -- to let them review it.

11  Q.   And if they find probable cause, what does the judge then

12  do -- or the magistrate?

13  A.   They would sign it, then hand it off to one of their

14  secretaries, and they would make you copies, let you know that

15  you're good to go.

16  Q.   Okay.  But in this instance, you deviated from the use of

17  the magistrate court form; is that right?

18  A.   Yes, ma'am.

19  Q.   And why did you deviate?

20  A.   It was in circuit court, and all the forms automatically

21  say "Magistrate Court" on top.  And I thought whiting that out

22  would look very bad.

23  Q.   Okay.  And so I think you told me -- you already testified

24  to it, but where -- from where did you get the form at?

25  A.   My detachment commander at the time.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  Q.   All right.  Is it -- is it fair to say that everything

2  included in the magistrate court affidavit is also included in

3  your affidavit for complaint for search warrant?

4  A.   Yes, ma'am.

5  Q.   Okay.  Let's talk about a few sections.  Let's start with

6  how did you determine that you wanted to search -- let me back

7  up.

8      In your preparation for this search warrant, where did you

9  identify was the location you wanted to search?

10 A.   I ran Mr. Seeger's name through our DMV database and

11 obtained an address off of his driver's license of 310 Hilltop

12 Drive, Bruceton Mills, West Virginia.

13 Q.   Okay.  And why did you decide you wanted to search his

14 residence as opposed to, like, where he worked?

15 A.   Based on the training and limited experience I had at the

16 time, a lot of times when people have stuff that they don't

17 want other people to know about or a lot of people would

18 consider taboo and inappropriate, they're not going to hide it

19 somewhere where other people could potentially find it.  And

20 then they also like to keep it close on hand.  If they have the

21 urge in the middle of the night, they don't want to have to

22 drive far to go get it.

23 Q.   Okay.  And we discussed a little piece of this.  But in

24 your probable cause statement, it was your testimony you didn't

25 include any of the statements made to you by Corporal Lee.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1    Can you tell us why you didn't include them?

2    A.   When I spoke to Corporal Lee, it felt like the majority of

3    his investigation was kind of geared more toward the revenge

4    porn side of when the -- when K.S. was already an adult.

5    And then, also, while I do trust other officers and not

6    think that they would provide me with any information that is

7    incorrect, it's kind of hard to testify to someone else's --

8    what they tell you when they're so far away.  Because if a

9    judge had an issue with it, then there really wouldn't be a way

10   to back it up.  So I only wanted to use information that I was

11   given directly from the victim as to keep it as honest as it

12   could be.

13   Q.   And along that same vein, you also didn't include

14   statements given to you by Professor Roth.

15   Can you tell the Court why you didn't include those

16   statements?

17   A.   The majority of what Professor Roth talked to me about was

18   solely just the -- again, what is commonly referred to as

19   "revenge porn," which at this point in my investi- -- with what

20   I had learned from K.S. was not geared toward what I was trying

21   to get a search warrant for.

22   Q.   Okay.  And did you have any concern about that information

23   provided to Professor Roth was from another party; it wasn't

24   his information that he knew?

25   A.   That was also a large part of it.  It was very third party

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  in terms of he had heard it -- he was kind of repeating what

2  someone else had told him.  So it kind of loses its credibility

3  as the telephone game gets worse.

4  Q.   Okay.  Regarding the statement that you did include, you

5  included information that was specifically provided to you by

6  K.S.

7  A.   Yes, ma'am.

8  Q.   Did you reference at all in that statement whether or not

9  she had, in the past, provided false information to Mr. Seeger?

10 A.   I did, ma'am.

11 Q.   Okay.  You presented your affidavit and complaint for a

12 search warrant to Judge Shaffer in Preston County?

13 A.   Yes, ma'am.

14 Q.   And did he swear you in?

15 A.   Yes, ma'am.

16 Q.   And did you discuss the affidavit?

17 A.   Yes, ma'am.

18 Q.   And do you know whether he found probable cause?

19 A.   I believed he did, ma'am.  He signed the bottom of it, and

20 he didn't tell me I needed to fix anything.

21 Q.   Okay.  After he signed it, did he give you any

22 instructions of what you were to do with it?

23 A.   He told me it was good, to take it over to his clerk in

24 another office across the hall and they would take care of

25 getting it on record and everything and give me my copies.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1   Q.    And when you left the courthouse on March 29th of 2021,

2   after swearing out your affidavit, did you believe you had

3   authorization to search Mr. Seeger's residence?

4   A.    Yes, ma'am.

5   Q.    Okay.

6           MS. CROCKETT:  Your Honor, permission to approach the

7   witness?

8           THE COURT:  You may.

9           MS. CROCKETT:  Okay.

10       Marty, I'm just going to show him the --

11          MR. SHEEHAN:  Is that the warrant?

12          MS. CROCKETT:  Uh-huh.

13          MR. SHEEHAN:  Yeah, that's fine.

14  BY MS. CROCKETT:

15  Q.    If you could just look at that and tell me if you can

16  identify it.

17  A.    This is the affidavit and complaint that I filled out on

18  March 29th.

19  Q.    Okay.  And it -- I'm sorry.  I've handed you what's been

20  marked as Government's Exhibit --

21  A.    One.

22  Q.    -- 1.  And you've identified it as the affidavit for

23  complaint for search warrant?

24  A.    Yes, ma'am.

25  Q.    How do you know what that is?

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  A.   It's on top, in bold, "Affidavit and Complaint for Search
2  Warrant."
3  Q.   Is that the only way you recognize it, or is there another
4  way?
5  A.   I was the one that filled this out, ma'am.
6  Q.   Okay.  And is that your signature that appears on the
7  second page?
8  A.   Yes, ma'am, it is.
9  Q.   Okay.  And there are two signatures on that affidavit; is
10  that right?
11  A.   Yes, ma'am.
12  Q.   Who is the second signature?  Whose signature is the
13  second signature?
14  A.   To me, that's Judge Shaffer's signature.
15  Q.   Okay.  And did he sign that in your presence?
16  A.   Yes, ma'am.
17  Q.   Okay.  And did you sign it in his presence?
18  A.   I cannot recall whether I signed it in his presence or
19  before I got to his office.
20  Q.   Okay.  Did he swear you in?
21  A.   Yes, ma'am.
22  Q.   And did you affirm for him that the information contained
23  on the affidavit for complaint for search warrant was true and
24  accurate?
25  A.   Yes, ma'am.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  Q.   Okay.  And I think you testified already that that's his
2  signature appearing on there.
3       MS. CROCKETT:  I'd move Government's 1, Your Honor.
4       THE COURT:  Any objection to the Court receiving 1
5  for today's purposes?
6       MR. DYER:  No, sir.
7       THE COURT:  All right.  Without objection, 1 will be
8  received into today's record.
9       MS. CROCKETT:  Thank you, Your Honor.
10      (Government's Exhibit 1 received in evidence.)
11  BY MS. CROCKETT:
12  Q.   Okay.  And so when you also left on March 29th of 2021,
13  that day, after you received the affidavit and complaint for
14  search warrant, did you believe that you had both an affidavit
15  for search warrant and a search warrant?
16  A.   Yes, ma'am.
17  Q.   Okay.  I asked you if you believed you were authorized to
18  search.  And you believed, in fact, that you were authorized to
19  search his residence.
20  A.   Yes, ma'am.
21  Q.   Okay.  When the United States Attorney's Office reached
22  out to you after the filing of the motion to suppress, did you
23  believe that Judge Shaffer issued you a search warrant on
24  March 29th of 2021?
25  A.   Yes, ma'am.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  Q.   And when we met on Friday, April 11th, after you had an

2  opportunity to look at the documents in question, what was your

3  recollection about the search warrant?

4  A.   The page titled "Search Warrant" wasn't present, and I

5  kind of proceeded to have a tad bit of a panic attack about

6  whether or not I messed it up or I lost it between somewhere.

7  Q.   And did you reach out to, like, your agency to see if you

8  could locate it?

9  A.   I contacted the secretary of Kingwood to try to see if she

10  had some copy of it, to which I was advised that everything had

11  been either redacted and/or abolished because of an order that

12  was given by the court.

13  Q.   Is that the order for expungement?

14  A.   Yes, ma'am.

15  Q.   Okay.

16  A.   They tried to find it.  I was going to search my computer,

17  my department-issued laptop, but then I recalled that I've

18  received a new hard drive since then, as well as if I don't

19  purge older stuff off my computer it won't work anymore because

20  it gets too full.

21      And so I -- I had someone search my current desk at my

22  office to try to see if it was in a stack of papers that maybe

23  somehow I carried over from Kingwood, with no avail at that

24  either.  And it's just kind of continued to bother me for quite

25  some time on whether or not -- if it was a mistake of mine or

*T. Nicholson - Direct Examination (Ms. Crockett)*

1    not.

2    Q.    Okay.  You -- so is it fair to say today you don't have

3    any specific recollection of having a search warrant or having

4    any other documents other than what has been provided to the

5    parties in this case?

6    A.    I do not.

7    Q.    Okay.  Moving back to your investigation.  After you

8    received the documents from the clerk -- I think you said you

9    received a packet from the clerk.  Is that right?

10   A.    Yes, ma'am.

11   Q.    Does she provide you that packet in triplicate?

12   A.    Yes, ma'am.  It's triplicate, and then each set is stapled

13   when they give it to you.

14   Q.    Okay.  What did you do next with the documents after they

15   were provided to you?

16   A.    Held onto them for a couple hours until one of the

17   afternoon/evening shift troopers came out to assist me in a --

18   with the search.

19   Q.    Okay.  And so you executed a search at his residence on

20   that same day, March 29th of 2021?

21   A.    Yes, ma'am.

22   Q.    Okay.  Sitting here today, do you still believe that you

23   were authorized to search Mr. Seeger's residence?

24   A.    I do, ma'am.

25   Q.    When did you execute -- or I'm sorry.  Was anyone with you

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  when you executed the search warrant?

2  A.    Trooper Morris was also present.

3  Q.    Okay.  And did he start the search with you?  Or did

4  you-all wait and do that together?  Tell us what happened.

5  A.    When we arrived at the residence, we made contact with

6  Mr. Seeger.  And we kind of stayed out in his front yard for a

7  little bit.  I Mirandized Mr. Seeger, proceeded to ask him some

8  questions in relation to kind of slowly getting to why we were

9  there and K.S.

10      During this time, Trooper Morris was with me.  He was just

11  kind of standing a little bit back behind me, outside of view

12  of my body camera.

13  Q.    And --

14  A.    Sorry.

15  Q.    And was Mr. Seeger under arrest at the time you spoke with

16  him?

17  A.    No, ma'am.

18  Q.    And did he -- was he placed under arrest at any time

19  during your encounter with him on the 29th?

20  A.    No, ma'am.

21  Q.    Okay.  And do you see Mr. Seeger in the courtroom today?

22  A.    I do, ma'am.

23  Q.    If you could identify him.

24  A.    The gentleman on the other side of that box from where I'm

25  sitting.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1    THE COURT:  What's he wearing, trooper?

2    THE WITNESS:  He's wearing orange.  Brown hair,

3  comb-over.

4    THE COURT:  Understood.  The record will reflect the

5  trooper has identified the defendant.

6    MS. CROCKETT:  Thank you.

7  BY MS. CROCKETT:

8  Q.  You've referenced that the search occurred at 310 Hilltop

9  Drive.  And where is that near?

10  A.  Bruceton Mills.

11  Q.  And is that within the Northern District of West Virginia?

12  A.  Yes, ma'am.

13  Q.  Okay.  As part of your duties as a police officer, I think

14  you referenced you were -- you wear or were wearing on that

15  date a body-worn camera.

16  A.  Yes, ma'am.

17  Q.  Okay.  Where do you wear it?

18  A.  Ours is mounted under -- like, inside of our

19  department-issued shirts, in front of our vest in, like, a

20  special mount that the company provides.

21  Q.  And does it record all your interactions, or do you

22  control when it's activated and when it's turned off?

23  A.  We have policy that dictates when it must be on.  We do

24  have a little, like, watch-looking remote control to help us

25  control and turn it on and turn it off when we're done dealing

*T. Nicholson - Direct Examination (Ms. Crockett)*

1   with incidents.

2   Q.   Okay.  And so you -- did you activate your body-worn

3   camera on the day that you spoke with Mr. Seeger?

4   A.   Yes, ma'am.

5   Q.   Okay.  How is that video collected and maintained?

6   A.   It goes from the body camera itself, which is effectively

7   a smart phone that's been revamped with software to limit its

8   functionality, then it goes to what's called a Rocket IT, which

9   is mounted inside of our department-issued cruisers, which is

10  then sent through a secure mobile connection to secure servers

11  that are maintained by a company called Utility.  And then we

12  have access to watch it and review it on a software.  I think

13  they call it Polaris now, if I recall correctly.

14  Q.   Okay.  And after speaking with Mr. Seeger, you learned

15  that he actually had some experience with computers; is that

16  fair to say?

17  A.   Yes, ma'am.

18  Q.   Okay.  Let me back up.  Regarding the body-worn camera,

19  are you able to alter it or modify it in any way?  The video

20  footage.

21  A.   We can change the watermark that's on the video.  In some

22  situations, if we record video but we only need the audio --

23  which is typically only, like, a HIPAA situation, like if we

24  record inside of a hospital -- we can strip the audio from the

25  video and just have audio.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1    We are able to maybe dock a couple minutes off the front

2  or the end of a video, but it's documented and recorded inside

3  the Utility-owned, like, software, and it's heavily monitored

4  as to why we would be taking off time.

5  Q.   Okay.  And you've had an opportunity to review your

6  body-worn camera -- or footage before testifying today?

7  A.   Yes, ma'am.

8  Q.   And so "Nicholson" that appears across the screen when the

9  video footage starts, is that footage -- is that name something

10  that you would have added to it?

11  A.   Yes, ma'am.  It's typically our full email address, which

12  includes my first name, to which I avoid putting on stuff due

13  to questions.  So I change it to just say "Trooper Nicholson."

14  Q.   All right.  And in your review of the body-worn camera

15  footage, at any point during your interaction with Mr. Seeger

16  did you advise him that you had a warrant to search?

17  A.   I did, ma'am.

18  Q.   And in fact, did you advise him you had a warrant that was

19  signed by a judge?

20  A.   Yes, ma'am.

21  Q.   Okay.  And when you spoke to him that day and advised him

22  as such, did you believe, in fact, you had a warrant in your

23  possession?

24  A.   Yes, ma'am.

25  Q.   Okay.  So Mr. Seeger advised you that he worked with

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  computers.  And did he express to you any concerns about your

2  seizing any computers at the time of the search?

3  A.   He advised it would hamper his employment, to which,

4  honestly, I replied roughly that I did not care, as to the

5  purpose of the search warrant is to seize what is listed, not

6  to worry about too much of someone's personal ramifications of

7  taking their items.

8  Q.   Is it fair to say that even though you might have felt

9  that way, you did express care, because you did end up leaving

10  his work computer in his possession?

11  A.   Yes, ma'am, I did.

12  Q.   Okay.  Is Government's 1 still in front of you?

13  A.   Yes, ma'am, it is.

14  Q.   If you could read to us what evidence you were there to

15  seize.

16  A.   It states "all electronic storage devices, to include, but

17  not limited to, cellular phones, laptop computers, standalone

18  computers, memory cards, floppy discs, compact discs, smart

19  televisions, smart photograph frames, et cetera; all printed

20  photographs depicting nude juveniles; and all other evidence of

21  the crime of distribution and exhibiting the material depicting

22  minors engaged in sexually explicit conduct."

23  Q.   Okay.  So you were authorized -- you believed you were

24  authorized to seize anything that fell into that category.  Is

25  that fair to say?

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  A.    Yes, ma'am.

2  Q.    Okay.  But from review of the body-worn camera, I mean, we

3  can tell that there are some things that you chose -- you left

4  behind, you chose to leave behind; is that right?

5  A.    Yes, ma'am.

6  Q.    Okay.  You reviewed -- or you searched with Trooper Morris

7  the upstairs of the residence; is that right?

8  A.    Yes, ma'am.

9  Q.    And I think one bedroom.  Is that accurate?

10  A.    Yes, ma'am.

11  Q.    Okay.  Did you search anywhere on the main floor of the

12  residence?

13  A.    No, ma'am.

14  Q.    Did you search his garage or shed?

15  A.    No, ma'am.

16  Q.    And did you take all the electronic devices that you

17  located?

18  A.    No, ma'am.

19  Q.    Did you -- did you even locate any nude photographs?

20  A.    No physically printed-out ones, no, ma'am.

21  Q.    Okay.  Of child pornography, I should say.

22  A.    No, ma'am.

23  Q.    Okay.  And your search lasted roughly about 45 minutes.

24  A.    Yes, ma'am.

25  Q.    Okay.  All right.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1      MR. SHEEHAN:  The property receipt?  Yeah, that's
2   fine.
3      MS. CROCKETT:  Your Honor, may I approach again?
4      THE COURT:  You may.
5      MS. CROCKETT:  Thank you.
6   BY MS. CROCKETT:
7   Q.   If you could just -- I'm handing you what's been marked as
8   Government's Exhibit 5?
9   A.   Yes, ma'am.
10  Q.   If you could identify it.
11  A.   This is the property receipt that I filled out on
12  March 29th after searching Mr. Seeger's residence.
13  Q.   Okay.  And does that -- does that include a list of six
14  items seized from Mr. Seeger?
15  A.   Yes, ma'am.
16  Q.   And among those six items is there a black LG Nexus
17  00704D139354EFDC?
18  A.   Yes, ma'am.
19  Q.   And is there also a silver MacBook with a serial number --
20  a silver Apple MacBook W86450CGW0M?
21  A.   Honestly, the serial number is not on this.  It says
22  "silver Apple MacBook" with a model number.  I don't think I
23  was able to locate the serial number at the time.
24  Q.   Okay.  All right.  I have dyslexia.  I wish I had realized
25  that, because I struggled there trying to get through those

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  numbers.

2      Did you have Mr. Seeger confirm your seizure of those

3  items?

4  A.    Yes, ma'am.

5  Q.    And how does he do that?

6  A.    He signed the bottom of it, under the -- above the "Person

7  from whose premises the property was taken" line.

8  Q.    Okay.  And so Mr. Seeger's signature appears at the

9  bottom?

10 A.    It's a squiggle, but he's the one that signed it, ma'am.

11 Q.    Okay.  And your signature appears beside it?

12 A.    Above it.  Yes, ma'am.

13 Q.    Above it?

14             MS. CROCKETT:  Your Honor, I'd move Government's 5.

15             THE COURT:  Any objection to 5?

16             MR. DYER:  No objection.

17             THE COURT:  Without objection, it will be received

18 for today's purposes.

19      (Government's Exhibit 5 received in evidence.)

20             MS. CROCKETT:  Permission to approach again?

21             THE COURT:  You may.

22 BY MS. CROCKETT:

23 Q.    I'm handing you what's marked as Government's Exhibit 6.

24 Can you identify that?

25 A.    This is West Virginia State Police Form 114, the evidence

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  room receipt.

2  Q.   Okay.  And after your search of Mr. Seeger's property that

3  evening, where do you take the evidence?

4  A.   It's taken back to the detachment of which the county that

5  you executed the search warrant.  In this case it was the

6  Kingwood detachment of the West Virginia State Police.

7  Q.   Okay.  And when did you take it back?

8  A.   Immediately following leaving Mr. Seeger's residence.

9  Q.   So on March 29th of 2021?

10  A.   Yes, ma'am.

11  Q.   Okay.  And does anyone confirm receipt of those items once

12  you log them into evidence?

13  A.   The evidence custodian, who at this time was also the

14  detachment commander, is the -- receives them and places them

15  in a secured room after he removes them from the temporary

16  storage.

17          MS. CROCKETT:  Okay.  Your Honor, I'd move

18  Government's 6.

19          THE COURT:  Any objection?

20          MR. DYER:  No, sir.

21          THE COURT:  Without objection, received for today's

22  purposes.

23      (Government's Exhibit 6 received in evidence.)

24          MS. CROCKETT:  Number 7.  Government's 7.

25      Your Honor, permission to approach?

*T. Nicholson - Direct Examination (Ms. Crockett)*

1           THE COURT:  You may.

2   BY MS. CROCKETT:

3   Q.   I'm showing you what's marked as Government's 7.  Can you

4   identify that?

5   A.   This is a search warrant through magistrate court that I

6   completed to obtain the digital contents of the physical items

7   I seized.

8   Q.   Okay.  And that search warrant, you applied for that on

9   April 19th of 2021?

10  A.   Yes, ma'am.

11  Q.   And how many pages is it?

12  A.   Three pages, ma'am.

13  Q.   Okay.  And is -- is -- did I hand you just the search

14  warrant?  What -- tell -- if you could tell us exactly what I

15  handed you.

16  A.   It's a copy of the search warrant, the property receipt,

17  and the search warrant continuation page.

18  Q.   Okay.  And what is on page 2, then?

19  A.   The page labeled 2 on this is for search warrants.

20  Q.   I'm -- the -- what is your second page that I've handed

21  you?

22  A.   It is the property receipt.

23  Q.   And if you could note what you have listed as the

24  property.

25  A.   "Digital data."

*T. Nicholson - Direct Examination (Ms. Crockett)*

1   Q.   Okay.  And on your continuation sheet, do you continue to

2   reference the items that were seized at Mr. Seeger's residence

3   on March 29th of 2021?

4   A.   Yes, ma'am.

5   Q.   Okay.

6          MS. CROCKETT:  I'd move Government's 7.

7          THE COURT:  Any objection?

8          MR. DYER:  What is it?

9          MR. SHEEHAN:  It's the April search warrant.

10         MR. DYER:  Okay.  No objection.

11         THE COURT:  Without objection, so received.

12      (Government's Exhibit 7 received in evidence.)

13   BY MS. CROCKETT:

14   Q.   After you logged in the evidence, after you applied for

15   the secondary warrant to look inside the devices, what did you

16   do with the evidence?

17   A.   The evidence was retrieved out of the secure evidence room

18   of the Kingwood detachment, provided to me, and then I took it

19   straight to the West Virginia State Police Digital Forensics

20   Unit in Morgantown.

21   Q.   Okay.  So looking at the search warrant -- the secondary

22   search warrant from April, you executed that in Preston County?

23   A.   Yes, ma'am.

24   Q.   Okay.  And where is your evidence room located where

25   Mr. Seeger's items were taken after seizure?

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  A.   It would have been the Kingwood State Police detachment --

2  Q.   Okay.  And that is --

3  A.   -- in Preston County.

4  Q.   I'm sorry?

5  A.   In Preston County.

6  Q.   Okay.  And if I understand your testimony, then, after you

7  had the search warrant issued, you then drove the evidence to

8  Morgantown?

9  A.   Yes, ma'am.

10  Q.   Okay.

11         MS. CROCKETT:  Your Honor, permission to approach?

12         THE COURT:  You may.

13  BY MS. CROCKETT:

14  Q.   I'm showing you what's marked as Government's 8.  Can you

15  identify this?

16  A.   This is West Virginia State Police Form 53, the forensics

17  laboratory case submission form.

18  Q.   Okay.  And so is what you just testified to, is this you

19  dropping off the evidence at the digital forensics lab in

20  Morgantown?

21  A.   Yes, ma'am.

22  Q.   And how do you acknowledge that the materials have been

23  dropped off at the lab?  How is that memorialized on the form?

24  A.   At the bottom of the form it's signed by whichever lab

25  custodian takes possession.  In this case, it was Mr. Roony.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  And then he provided it with a laboratory case number, and then

2  I signed it.

3  Q.  Okay.  And what's the date that you dropped it off in

4  Morgantown?

5  A.  April 26th, 2021.

6  Q.  Okay.

7          MS. CROCKETT:  Permission to approach, Your Honor?

8          THE COURT:  You may.

9  BY MS. CROCKETT:

10 Q.  I'm showing you now what's marked as Government's 9.  Can

11 you identify that?

12 A.  This is another copy -- or kind of a future copy of the

13 West Virginia State Police Form 53, Forensics Laboratory Case

14 Submission Form.

15 Q.  Okay.  And what's different about this form as opposed to

16 the previous exhibit?

17 A.  This one documents that the items were returned to me in

18 person on June 21st of 2021.  It's signed by myself and

19 Mr. Roony.

20 Q.  Okay.  So the evidence remained in Mr. Roony's possession

21 until you went back and retrieved them?

22 A.  Yes, ma'am.

23 Q.  Okay.  And so what did you pick up from Mr. Roony when you

24 retrieved the devices?

25 A.  All six devices that I dropped off, as well as a CD that

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  had the forensic download on it.

2  Q.   Okay.  And that's the extraction of the LG Nexus and the

3  silver MacBook?

4  A.   Yes, ma'am.

5          MS. CROCKETT:  I'd move Government's 9, Your Honor.

6          THE COURT:  Any objection to 9?

7          MR. DYER:  No, sir.

8          THE COURT:  Without objection, so received for

9  today's purposes.

10      (Government's Exhibit 9 received in evidence.)

11  BY MS. CROCKETT:

12  Q.   Based upon your reports, there were contraband images and

13  videos of child pornography and evidence of enticement and

14  production of child pornography and solicitation within those

15  extractions?

16  A.   Yes, ma'am.

17  Q.   And the State of West Virginia indicted Mr. Seeger as a

18  result of those extractions?

19  A.   Yes, ma'am.

20  Q.   Ultimately, that matter in state court was dismissed; is

21  that right?

22  A.   Yes, ma'am.

23  Q.   Do you know why the matter was dismissed?

24  A.   I was advised by the Assistant Prosecuting Attorney of

25  Preston County, Ms. Megan Fields, it was due to an issue of

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  jurisdiction given that Mr. Seeger was living in Marion County

2  at the time of some of the counts.  And she just thought it

3  would conflict a little too much with trying to have multiple

4  counties involved towards the same goal and wished to attempt

5  to move it into the federal system.

6  Q.   Was there any concern raised with you that there was an

7  issue with regard to the search warrant or suppression in state

8  court?

9  A.   Never, ma'am.

10  Q.   Okay.  When you retrieved the evidence from Mr. Roony from

11  the digital forensic lab, where did you take the evidence?

12  A.   It returned to the state police detachment in Kingwood.

13  Q.   Okay.  And did it remain there until it was picked up by

14  the FBI as part of the federal investigation?

15  A.   Yes, ma'am.

16  Q.   Okay.  Trooper Nicholson, you had an opportunity -- we

17  talked about this.  You had an opportunity to review your

18  body-worn camera footage?

19  A.   Yes, ma'am.

20  Q.   Okay.  And we have it marked as Government's Exhibit 4; is

21  that right?

22  A.   Yes, ma'am.

23          MS. CROCKETT:  And Your Honor, I know we've provided

24  it to the Court.  Does the Court want me to provide it again?

25          THE COURT:  Sure.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1        MS. CROCKETT:  I'm happy to.  Okay.  All right.  I'd
2   move Government's 4.
3        THE COURT:  Any objection to the body cam footage?
4        MR. SHEEHAN:  Is it a CD or the audio?
5        MS. CROCKETT:  It's a thumb drive.
6        MR. SHEEHAN:  Thumb drive?  Of the body cam?
7        MS. CROCKETT:  Of the body cam footage.
8        MR. SHEEHAN:  No objection.
9        MS. CROCKETT:  All right.
10        THE COURT:  Without objection, we'll receive
11   Number 4.
12     (Government's Exhibit 4 received in evidence.)
13        MS. CROCKETT:  All right.  And all of the exhibits
14   are with you; is that right, Mr. Nicholson?  All the other
15   exhibits?
16        THE WITNESS:  Yes, ma'am.
17        MS. CROCKETT:  All right.  Let's provide those to the
18   clerk.
19        THE CLERK:  Thank you.
20        MS. CROCKETT:  That's all I have.  If you would just
21   give me one second, Your Honor.
22     Okay.  That's all I have.
23        THE COURT:  Any cross?
24        MR. DYER:  Yes, sir.
25        THE COURT:  I assume there's a motion to admit

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1  Government's 8?

2          MS. CROCKETT:  Yes, Your Honor.  My apologies.

3          THE COURT:  Any objection to 8?

4          MR. SHEEHAN:  No, sir.

5          MR. DYER:  Was that the body cam footage?

6          THE COURT:  No.

7          MS. CROCKETT:  That's 3.

8          MS. WALTERS:  That's 4.

9          THE COURT:  Four.

10          MS. CROCKETT:  Four.  That's right.  That's 4.

11          MR. DYER:  What was 8?

12          THE CLERK:  Eight was the forensic lab form.

13          THE COURT:  Can you tell Mr. Dyer what that is?  I'm

14  sorry.

15          MR. DYER:  Oh.  No objection.

16          THE COURT:  All right.  Without objection, it's also

17  received.

18      (Government's Exhibit 8 received in evidence.)

19          MS. CROCKETT:  Thank you, Your Honor.

20          THE COURT:  Go ahead, Mr. Dyer.

21          MR. DYER:  Thank you, Your Honor.

22                          CROSS-EXAMINATION

23  BY MR. DYER:

24  Q.   Trooper, you recall speaking with me on the phone -- I

25  don't know.  It's been a month, six weeks ago, roughly.  You

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1  tell me if you remember.

2  A.    I'm not sure to the -- it hasn't been that long, sir.

3  I've only been in a boot for about a month.

4  Q.    Had you spoken with anybody prior to having that

5  conversation with me about this search warrant issue?  Finding

6  a search warrant?

7  A.    No, sir.

8  Q.    Okay.  So I called you.  It seemed to me like that was a

9  matter of first impression for you.

10      The document that has been admitted and called the

11  affidavit, that is not a warrant; correct?  I mean, that's not

12  your idea of a warrant.

13  A.    It is not, sir.

14  Q.    All right.  And to your knowledge there is -- there exists

15  no evidence -- again, to your knowledge -- that there ever was

16  a warrant that was issued.

17  A.    To my knowledge, no, sir.  I can't say that there was.

18  Q.    Okay.  And have you looked at the body cam footage that

19  was produced?

20  A.    Yes, sir, I reviewed by body camera footage.

21  Q.    You can actually see the document that's in your hand --

22  A.    Yes, sir.

23  Q.    -- in that footage.  And that is the document that we've

24  admitted here today as the affidavit and complaint for search

25  warrant.

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1  A.   Yes, sir.

2  Q.   Correct?

3  A.   Yes, sir.

4  Q.   All right.  Do you have that in front of you?

5  A.   I turned it all over to the clerk already, sir.

6  Q.   Okay.  Let me -- I hate to jump around so much on you.

7  But do you have any memory at all of the conversation that you

8  had with Judge Shaffer?

9  A.   Not to any specifics, sir, no.

10 Q.   Okay.  Why is it -- when you -- when you decide you're

11 going to go get a search warrant, you say that -- in response

12 to the Government's questioning why you went to Judge Shaffer,

13 you had never done that before, had you?

14 A.   I had not, sir.

15 Q.   You --

16      Okay.  And I asked you this when we were speaking on the

17 phone.  You said you went there because it was a court of

18 record.

19 A.   That's how it was referred to me by my detachment

20 commander.

21 Q.   And that was sergeant who?

22 A.   Sergeant Wyatt.

23 Q.   Wyatt?

24 A.   Yes, sir.

25 Q.   W-Y-A-T-T?

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1    A.    Yes, sir.

2    Q.    Okay.  And when you went and told him about this

3    investigation, he suggested to you to use a template, a form

4    that he provided to you.

5    A.    Yes, sir.

6    Q.    Prepare it so it was suitable for the facts of this case.

7    A.    Yes, sir.

8    Q.    And take it to Judge Shaffer, a circuit judge.

9    A.    Yes, sir.

10   Q.    And did he -- was it his words that -- to do that because

11   that's a court of record?

12   A.    Yes, sir.

13   Q.    Okay.  The -- you had used these preprinted forms

14   previously, that you took to magistrate court.

15   A.    The com- -- yes, sir.

16   Q.    Okay.  You -- I believe you had responded you had sought

17   warrants dozens of times in your 24-26 months as a trooper.

18   Yes?

19   A.    Yes, sir.

20   Q.    Okay.  And these forms were available to you at the time

21   that you prepared this form from the template that Sergeant

22   Wyatt gave to you to prepare.  These other forms were available

23   to you.  Yes?

24   A.    Yes, sir.

25   Q.    Okay.  Did you ask him why you wouldn't be using those

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1   forms?

2   A.   I did not, sir.  He just said that he had a template and

3   he would provide it to me.

4   Q.   Okay.  But, I mean, you went to him for a reason.  Did he

5   instruct you to not use the forms?

6   A.   He did not, sir.  The forms already come saying

7   "Magistrate."

8   Q.   Right.

9   A.   And being it's an Adobe file, it cannot be altered to say

10  "Circuit Court" where it says, like, "Magistrate Court" in the

11  middle of the paragraphs.  So there's no way to make the forms

12  for circuit court, the ones that we have.  I don't pay for

13  Adobe Pro to alter those.

14  Q.   But I guess my question is why didn't you just

15  automatically assume you could take an application or

16  complaint, an affidavit in support for an application for a

17  search warrant, to the magistrate, as you always had done

18  before?

19  A.   I was going by the recommendation of my detachment

20  commander who had far more years of law enforcement experience

21  than I did.

22  Q.   Okay.  So he kind of interceded and said, "Use this."

23  A.   Roughly.  Yes, sir.

24  Q.   And to your knowledge, was there any other documents

25  provided to you by Sergeant Wyatt other than the document that

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1  we've referred to here today thus far?

2  A.    That was the only document I received, sir.

3  Q.    Okay.  So when you meet with Judge Shaffer in his office,

4  he swears you in.

5  A.    Yes, sir.

6  Q.    And you have a discussion about this affidavit and

7  complaint for search warrant.  Does he inquire of you, "Where

8  is the warrant?"  Do you remember?

9  A.    I cannot recall if that was a question that was asked at

10 the time, sir.

11 Q.    Okay.  I mean, you -- were you making an assumption or

12 presumption that his office was going to provide an additional

13 document called a warrant?

14 A.    That's what I believe would happen, sir, yes.

15 Q.    Okay.  So did you -- if you anticipated that, did you go

16 seek that document out from Judge Shaffer or his clerk or

17 anyone else at the courthouse?

18 A.    He had -- after he had signed it, he'd told me to take it

19 over to the clerk's office is what I did.  And then I received

20 stapled papers back, sir.  I believed that everything was there

21 that I needed.

22 Q.    You took this document, this affidavit and complaint, to

23 the -- his law clerk?  His --

24 A.    The --

25 Q.    The circuit clerk?  Or do you know?

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1  A.   I believe it's the circuit clerk, sir.

2  Q.   Ms. Leishman?

3  A.   If that's who it was at the time, sir.  I'm not --

4  Q.   You don't -- okay.

5  A.   -- familiar with the names at the time.

6  Q.   Somebody in the circuit clerk's office.

7  A.   Yes, sir.

8  Q.   Did you wait around for this document to be handed back to

9  you?

10  A.   Yes, sir, from my recollection.

11  Q.   Okay.  And then you took the document that was returned to

12  you --

13  A.   Yes, sir.

14  Q.   -- and went to the Seeger residence with that document.

15  A.   Yes, sir.

16  Q.   Okay.  Do you have any prior experience -- before your

17  involvement in this case, did you have any prior experience in

18  investigating any child porn cases?

19  A.   I cannot recall if I have, sir, but I feel as though I

20  would have.

21  Q.   Okay.  Any, I mean, revenge porn?  Anything of that nature

22  that you recall?

23  A.   I cannot recall working any other revenge porn cases, no,

24  sir.

25  Q.   Okay.  The -- this affidavit, you say that you did not

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1  include Corporal Lee's remarks or comments to you because it

2  was a third party making those statements to you and you

3  wouldn't be able to explain or support any other -- any of

4  those kind of remarks to the judge in your discussions with him

5  about the affidavit?

6  A.   In terms of what Corporal Lee advised me, yes.  In terms

7  of if the judge had more questions about what was spoken to

8  Corporal Lee, I couldn't really testify to that.

9  Q.   Okay.  I mean, he is in a better -- did he explain to you

10 that -- I thought your testimony was that he was able to assess

11 the body language of this young lady, K.S., in arriving at the

12 conclusion that she was being somewhat less than truthful,

13 something other than completely truthful.  Yes?

14 A.   Yes, sir.

15 Q.   So, I mean, I -- did that not lead you to conclude he's

16 actually in a better position than you are to assess her

17 credibility?  Yes?

18 A.   I'm not sure, sir.

19 Q.   I mean, you're speaking to her on a telephone; right?  Not

20 a video.

21 A.   Yes, sir.

22 Q.   Okay.  All right.  Did -- he testified that you reached

23 out to him.  You called him.  Did he call you?

24 A.   My report shows that I called him.  So based on my report,

25 I did call him.  I'm not real sure how I got the notice to call

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1  the Nacogdoches Police Department or what led to my desire to

2  do that.  I believe that I may have had a message, but I may be

3  a tad wrong on exactly what caused me to reach out to Corporal

4  Lee.

5  Q.  Okay.  In your -- in your report, I mean, you're

6  confirming you -- and this was a little bit of a concern about

7  including too much about what Corporal Lee said.  Because he's

8  investigating a revenge porn allegation, and you're looking

9  into a child porn case; right?

10  A.  Yes, sir.

11  Q.  Okay.  And at the top of your report of criminal

12  investigation, you say on March 29 you're contacted by K.S. to

13  file a child porn complaint against Steven Seeger.

14  A.  Yes, sir, that's what it says.

15  Q.  All right.  Now, your information, as I review -- this

16  conver- -- you have a telephone conversation back on the 29th

17  of March.

18  A.  Yes, sir.

19  Q.  With K.S.

20  A.  Yes, sir.

21  Q.  And you record that.  Yes?

22  A.  Yes, sir.

23  Q.  She tells you in March of 2021 that, when she was 14, she

24  is providing to Mr. Seeger these purportedly or potentially

25  pornographic images of herself.  Yes?

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1  A.    Yes.

2  Q.    All right.  But that the -- the images that she had called

3  to complain about with Corporal Lee were all images of her

4  after she was 18.

5  A.    Yes, sir.

6  Q.    And she says twice, in direct response to your inquiry "Do

7  you know if he stored any of these pictures or he still has any

8  of these pornographic pictures?" and she says, "No.  No idea."

9  Correct?

10  A.    Yes, sir.

11  Q.    So she's telling you she's got no idea whether she's

12  got -- or whether or not Steven Seeger has any pornographic

13  images of her as somebody under 18 years of age; correct?

14  A.    Yes, sir.

15  Q.    Okay.  You had any conversations with Judge Shaffer about

16  this matter?

17  A.    I have not, sir.

18  Q.    No conversations with Corporal Lee.

19  A.    Not since the one that was talked about in the --

20  Q.    That's what I'm talking about.  Yes, sir.

21  A.    Yes.

22  Q.    You said that when you executed this first search warrant

23  that you searched upstairs and one room downstairs and you had

24  left some items behind.

25  A.    Items were left behind.

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1  Q.   What items were left behind, trooper?

2  A.   Mr. Seeger had advised that he had a work laptop when we

3  were in the room, and you can also see it on by body camera

4  footage.  It looked like it had a lot of technical information

5  up on the screen and such.  I didn't -- after learning what

6  Mr. Seeger did, I didn't feel as though the laptop was needed

7  to be taken and looked at by our lab.

8  Q.   Okay.  Meaning he -- his work with NASA.

9  A.   Yes, sir.

10  Q.   So you just left that one behind for that reason.

11  A.   Yes, sir.  I didn't think the government would appreciate

12  us taking their stuff.

13  Q.   Okay.  Let me -- when you make the decision that you need

14  a second warrant to take a look at the devices that you seize

15  as a result of the search that followed the first --

16  A.   Yes, sir.

17  Q.   -- complaint and affidavit --

18  A.   Yes, sir.

19  Q.   -- did you make that decision yourself?

20  A.   It's the typical practice when we obtain things that have

21  digital information.  You get one search warrant to get the

22  physical item itself and then a second search warrant to get

23  the digital contents.

24  Q.   Okay.  All right.  The -- and the preprinted forms are

25  used --

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1  A.    Yes, sir.

2  Q.    -- for the second one.

3  A.    Yes, sir.

4  Q.    Was there a reason that there was a distinction there?

5  A.    I cannot -- I don't know why I decided to do magistrate on

6  that one.  I think that's just what I went with.  So...

7  Q.    Okay.  All right.  The i- -- the devices have to be looked

8  at at this forensic laboratory in Morgantown; right?

9  A.    Yes, sir.

10 Q.    You know, when you make the decision "I need a warrant,"

11 you're getting a warrant for the purpose of actually looking at

12 the information on the devices.

13 A.    Yes, sir.

14 Q.    And the only place in the world -- well, in your

15 neighborhood that can be done is in Morgantown; right?

16 A.    Yes, sir.

17 Q.    Why do you -- why do you seek a warrant in Preston County

18 which, you say yourself, in your own report, is executed in

19 Monongalia County?

20 A.    The items cannot be removed from the Kingwood detachment

21 evidence room without a search warrant from there to get them

22 out to get them downloaded.

23 Q.    Well, who told you that?

24 A.    That was just the practice of the detachment, sir.

25 Q.    Okay.  But, I mean, the purpose of a warrant is not to

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1   remove items from one location to another; correct?

2   A.   It was more of the -- when I say that, it's the detachment

3   commander.  Unless you can show him that you have a reason to

4   remove them from the evidence room, he was not going to, like,

5   sign them out and give them to you.  So not necessarily just to

6   physically remove them from the buil- -- like, from that -- the

7   room that they're locked in, but to be able to -- like, you

8   have to have a reason.  So the reason was we got a search

9   warrant to download the items.

10  Q.   Okay.

11  A.   And then they were taken and it was served.

12  Q.   Okay.  But you explain the purpose of this search warrant

13  in this affidavit; right?

14  A.   Yes, sir.

15  Q.   And you meet with a magistrate.

16  A.   Yes, sir.

17  Q.   You have a discussion with him.

18  A.   Yes, sir.

19  Q.   Explain that the exclusive purpose of this document, this

20  search warrant, is to examine these devices, which will be done

21  in Morgantown.

22  A.   Yes, sir.

23  Q.   Okay.  All right.  But that's just the way you had always

24  done it.

25  A.   Yes, sir.

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1  Q.   The detachment.

2       Okay.  You had made a comment previously about money being

3  exchanged between K.S. and the defendant, Steve Seeger.  What

4  did you mean by that?  Which direction was that money going?

5  A.   What do you mean by money, sir?

6  Q.   Well, you said when you spoke with her that there was --

7  there was discussion about money being provided.

8  A.   K.S. had said that Mr. Seeger had paid for, I think, some

9  type of college prep course and some -- kind of some other

10 stuff and just in terms of giving her things as part of their

11 relationship when she was an adult.

12 Q.   So your understanding of that was Mr. Seeger was providing

13 money to K.S.

14 A.   In some way, shape, or form, yes, sir.

15 Q.   Let me see if we're about ready to wrap up, trooper.

16      Let me ask you this.  I mean, have you ever since used the

17 template, the --

18 A.   There was --

19      Sorry.  There was one other occasion, sir.

20 Q.   Okay.  Did -- was there a -- was there an actual search

21 warrant that accompanied that complaint and affidavit?

22 A.   I used the exact same template, and it was in the exact

23 same courtroom -- or judge's chambers, sir.  It was an issue of

24 an inmate in Hazelton needing DNA taken from -- an agency, I

25 believe in Colorado, had come over needing DNA from an inmate

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1  at Hazelton.

2  Q.   Okay.  You don't recall the name of that one, do you?

3  A.   The inmate?

4  Q.   Yeah.

5  A.   I do not, sir.  I had no reason to investigate him.  It

6  was just kind of an agency assisting another agency thing.

7        (Pause in proceedings.)

8  BY MR. DYER:

9  Q.   The -- you --

10         MR. DYER:  Your Honor, can I approach the --

11         THE COURT:  You may.

12         MR. DYER:  -- witness?

13         MS. CROCKETT:  Can I see what you're --

14         MR. DYER:  I'm sorry.

15         MS. CROCKETT:  All right.

16  BY MR. DYER:

17  Q.   Trooper, that's the affidavit and complaint that we've

18  been discussing.  Did you read that, review it after you typed

19  it up or before or during your typing that up?

20  A.   It's my typical practice, after I type something, to

21  proofread it to make sure I don't have any grammical [sic]

22  errors.

23  Q.   Is that document prepared by you from scratch?

24  A.   This was -- again, it was a template that was given to me

25  by Sergeant Wyatt in a Word document.

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1  Q.   Okay.

2  A.   I went in and changed the relevant information to the

3  information of this investigation rather than what he had in

4  it.

5  Q.   Okay.

6  A.   I'm unaware of what that was at this time.

7  Q.   I mean, that document -- there's nowhere in that document

8  where the Court is directing or ordering or authorizing you to

9  go to Mr. Seeger's residence and conduct a search; correct?

10 A.   This is just the affidavit and complaint, sir.

11 Q.   Okay.  All right.  The --

12      One last question.  The forms that you use.

13          MR. DYER:  Your Honor, if I might approach again.

14          THE COURT:  You may.

15          MR. DYER:  These are the preprinted forms.

16 BY MR. DYER:

17 Q.   Trooper, those are the --

18      I'm going to ask you.  Are those the preprinted forms that

19 you use when you approach a magistrate in your efforts to

20 secure a search warrant?

21 A.   I believe this might be an older revision, but yes, sir.

22 Q.   Okay.  Well, those forms, at the bottom, say they were

23 last revised July of 2016.

24 A.   Yes, sir.  I thought you were talking about currently,

25 sir.  I apologize.

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1   Q.    Are there more recent revisions to your knowledge?

2   A.    I believe there were, but I may be wrong, sir.  I don't

3   check the revision date.  I just know sometimes, every couple

4   years, they redo them.

5   Q.    Okay.  But at the least, this version of the form, which

6   has a directive to go search, that was available to you.

7   A.    Yes, sir.

8   Q.    Okay.

9           MR. DYER:  Anything?

10      (Pause in proceedings.)

11  BY MR. DYER:

12  Q.    The form property receipt bears the same date of

13  preparation by the document preparer.  It's last revised in

14  July of 2016.  Yes?

15  A.    Yes, sir.

16  Q.    Okay.  All right.  Trooper, I think that may be all for

17  now.

18          THE COURT:  Any redirect, Ms. Crockett?  And you all

19  are --

20          MS. CROCKETT:  One more.

21          THE COURT:  And you all are running out of daylight.

22          MS. CROCKETT:  One question.

23          MR. DYER:  I appreciate your candor.

24          THE COURT:  Famous last words, but go ahead.

25          MS. CROCKETT:  I promise, Your Honor.

*T. Nicholson - Redirect Examination (Ms. Crockett)*

1                        REDIRECT EXAMINATION

2  BY MS. CROCKETT:

3  Q.    Trooper Nicholson, Mr. Dyer asked you whether or not

4  Corporal Lee was in a better position to gauge, I guess, the

5  veracity or truthfulness of K.S.

6       Did you have any question -- or any reason to question her

7  truthfulness with you when she made her report on March 29th

8  of 2021?

9  A.    I did not, ma'am.

10           MS. CROCKETT:  Okay.  That's all I have.

11           THE COURT:  Recross?

12           MR. DYER:  We have nothing further, Your Honor.

13  Thank you.

14           THE COURT:  Thank you, sir.  You can go ahead and

15  step down.  Thank you very much.

16       You can just leave that there, sir, and we'll take care of

17  that.  Thank you so much.

18       Do you need to recall Mr. Lee, or do we need to get Judge

19  Shaffer on the phone?

20           MS. CROCKETT:  Judge Shaffer, Your Honor.  Yeah.

21           THE COURT:  Okay.

22           MS. CROCKETT:  You -- I think you can stay in.

23           THE COURT:  Are you still calling the circuit clerk?

24       I'm sorry.  What?

25           MS. CROCKETT:  He was asking if he had to leave.  And

*T. Nicholson - Redirect Examination (Ms. Crockett)*

1    I'm not recalling him, so...

2          THE COURT:  Do you --

3          MR. SHEEHAN:  No.  He can stay.

4          THE COURT:  You can have a seat, trooper.  Yeah.

5    Thank you.

6      Mr. Sheehan, Mr. Dyer, are you-all calling the circuit

7    clerk today as well?

8          MR. SHEEHAN:  We may.

9          THE COURT:  Okay.

10          MR. SHEEHAN:  It --

11          THE COURT:  You guys have --

12          MR. SHEEHAN:  We might get it out of Judge Shaffer.

13          MS. CROCKETT:  Your Honor, can I ask the Court what

14   its posture will be when we hit the golden hour at five?  Like,

15   I --

16          THE COURT:  You've got until 5:05.

17          MS. CROCKETT:  And then, Your Honor, what --

18          THE COURT:  Uh-huh.

19          MS. CROCKETT:  How will the Court hear the rest of

20   the evidence?  Are we --

21          THE COURT:  That's a wonderful question.  We'll have

22   to figure that out.

23          MS. CROCKETT:  Okay.  All right.  So we'll get

24   another date, then, from the Court, I'm assuming.  Maybe.

25          THE COURT:  We'll try to find one.

*T. Nicholson - Redirect Examination (Ms. Crockett)*

1          MS. CROCKETT:  May I approach the clerk, Your Honor,

2    just to confirm the number?

3          THE COURT:  You may.

4       (Pause in proceedings.)

5          JUDGE SHAFFER:  Hello.  Hello.

6          THE COURT:  Good afternoon.  Judge Shaffer?

7          JUDGE SHAFFER:  Yes, sir.

8          THE COURT:  Hi.  Good afternoon.  This is Tom Kleeh

9    down in Clarksburg.  Thank you so much for --

10          JUDGE SHAFFER:  Okay.  Just a minute, Judge Kleeh.

11   Just a second.

12       (Pause in proceedings.)

13          MS. CROCKETT:  I think he's on the bench, Your Honor.

14          JUDGE SHAFFER:  Okay.  I'm sorry, sir.

15          THE COURT:  Oh, that's all right.  Thank you so much,

16   Judge, for joining us.  I won't belabor the point.  The next

17   voice you'll hear is Madam Clerk, who -- I'm going to ask her

18   to swear you in.  Then Ms. Crockett has some questions for you.

19          JUDGE SHAFFER:  Okay.  And Your Honor, my right hand

20   is in the air, sir.

21          THE COURT:  I'm sorry, Judge.  What was that?

22          JUDGE SHAFFER:  I said my right hand is in the air.

23          THE COURT:  Understood.  Thank you.

24          THE CLERK:  Thank you, Judge.

25       (JUDGE STEVEN L. SHAFFER, GOVERNMENT'S WITNESS, SWORN)

*Judge Steven L. Shaffer - Direct Examination (Ms. Crockett)*

1    THE CLERK:  Thank you.

2    THE COURT:  Go ahead, Ms. Crockett.

3                DIRECT EXAMINATION

4  BY MS. CROCKETT:

5  Q.   If you would just state your name for the record.

6  A.   My name is Steven Lee Shaffer.

7  Q.   And how are you employed?

8  A.   I am employed through the West Virginia Supreme Court as a

9  Circuit Judge of the 22nd Judicial Circuit, which encompasses

10 Preston and Tucker counties.

11 Q.   And before that were you a circuit court judge in another

12 judicial circuit?

13 A.   Yes.  Prior to -- prior to January 1st of 2025 I was the

14 circuit judge in the 18th Judicial Circuit, which only

15 encompassed Preston County, West Virginia.

16 Q.   Okay.  On a previous date, Judge Shaffer, did the Preston

17 County Prosecuting Attorney's Office file with -- file with you

18 a pleading seeking access to a file involving a Steven David

19 Seeger?

20 A.   Yes.  There had been a case involving Mr. Seeger, and that

21 case got dismissed.  And there was a motion for expungement of

22 those records.  Yes.

23 Q.   Okay.  And that case number would have been 22-F-50?

24 A.   To the best of my knowledge, yes.

25 Q.   Okay.  Let me ask you this.  Judge Shaffer, did you

*Judge Steven L. Shaffer - Direct Examination (Ms. Crockett)*

1  prepare an affidavit entitled "Affidavit of Steven L. Shaffer"

2  and provide it to Megan Fields, Chief Assistant Prosecuting

3  Attorney for Preston County?

4  A.   Yes, ma'am.  Ms. Fields contacted me and asked if I would

5  prepare an affidavit to provide to I guess the Court or to

6  whomever she was going to give it to regarding my involvement

7  with this matter.

8  Q.   And did you execute that affidavit on April 2nd of 2025

9  before Christy Hartsell?

10  A.   I believe that was the date.  I believe it was

11  April 2nd, yes.

12  Q.   Okay.  If that's the date reflected on the affidavit,

13  would that be accurate?

14  A.   Yes.  If that's the date on the affidavit, that would be

15  correct.

16  Q.   Okay.  And in essence, the reason for the affidavit was so

17  that you could explain to the Court what your process was for

18  issuing a search warrant; is that right?

19  A.   Yes.  Yes.

20  Q.   If you could, just for the record, just tell us what your

21  process is, Judge.

22  A.   Okay.  Well, basically, usually officers, if I'm here at

23  the courthouse, they will contact my assistant.  And they'll

24  say they have search warrants and their search warrant, and

25  they'll want to know if they could come to the office.  And,

*Judge Steven L. Shaffer - Direct Examination (Ms. Crockett)*

1    you know, if they do that, I follow the same procedure here at

2    the office as I do at my house, if they happen to come to my

3    house and have a search warrant also.  That would be after

4    hours, on weekends, or whatever.

5        Basically, when they bring the information in to me, there

6    is usually two documents.  Basically I will read through both

7    documents to familiarize myself with them.  There is a search

8    warrant.  There is an affidavit and complaint for the search

9    warrant.  And after I read through it, I will then place the

10   officer under oath, and I will make him swear to the fact that

11   the allegations in the petition are true and accurate; and if

12   they're based upon information provided by a third party, that

13   they believe that to be a credible source.

14   Q.   Okay.  And specifically we were asking you about whether

15   or not there was a search warrant that you would have issued in

16   the case involving Mr. Seeger; is that right?

17   A.   You know, to the best of my knowledge, usually there is

18   a -- like I said, there is a search warrant and an affidavit

19   and complaint for the search warrant.  And I will read both

20   those documents.  A lot of times the same information is on

21   both documents.

22   Q.   Okay.  And --

23   A.   Now, I can't -- I can't sit here and tell you that the

24   title of one of them was a Search Warrant and the title of the

25   other one was Affidavit and Complaint for Search Warrant.

*Judge Steven L. Shaffer - Direct Examination (Ms. Crockett)*

1    I mean, you know, I can't -- I don't even remember Trooper

2    Nicholson.  So I can't sit here and tell you that that's what

3    it was.

4    Q.   Okay.  I guess what I'm specifically asking is:  Based on

5    the request of the Preston County Prosecutor's Office, you did

6    look in Mr. Seeger's file, and you were able to determine that

7    there wasn't a document inside that file that was titled

8    "Search Warrant."  Is that fair?

9    A.   That is a hundred -- that is a hundred percent clear.

10   When Ms. Fields filed her motion regarding that, basically she

11   had actually used a -- the code section 61-11-26.  And as my

12   law clerk -- I put him on the trail of looking to see about an

13   expungement record.  And basically we found the code section

14   West Virginia Code 61-11-26(m) and 61-11-25(f).

15       And as I looked at those two code sections and -- I knew

16   that Mr. Seeger's would fall under 61-11-25(f).  And so that's

17   the code section I used, which was just a little bit different

18   than 61-11-26(m).

19   Q.   Okay.  And so you're saying you looked at your authority

20   to open an expunged record.  And using that authority, you can

21   confirm that there wasn't a document inside that file titled

22   "Search Warrant."

23   A.   Yeah.  Yeah.  There was not a document in there that said

24   "Search Warrant."  There was an affidavit.  I believe -- I

25   can't remember if it was entitled "Affidavit and Complaint" or

*Judge Steven L. Shaffer - Direct Examination (Ms. Crockett)*

1  "Affidavit for Search Warrant" or what it was called.  But

2  there was not a search warrant in that -- in that sealed file.

3  Q.   Okay.  In your review of the affidavit for -- affidavit

4  and complaint for search warrant, you did notice, though, that

5  your signature was affixed to the affidavit; is that right?

6  A.   Yes, I did.  That's the only way I knew that I had signed

7  that.

8  Q.   Okay.  And then the fact that your signature appears on

9  that document, does that confirm for you that you found

10  probable cause based on your review of the affidavit?

11  A.   Yes.  Because like I said, I read all these that come in.

12  And, you know, matter of fact, the officers I think sometimes

13  get disgusted because I take my time and read through

14  everything.

15  Q.   Okay.  And then if I understood your practice, you said

16  your practice is to review both, swear the officer if you find

17  probable cause, and then have them report to the circuit

18  clerk's office to retrieve whatever copies they take with them.

19       Is that right?

20  A.   Yes.  Once I sign them, the documents are handed back to

21  the officer, and I tell them they have to go to the clerk's

22  office and she will make their copies.

23       And then until this came about, I did not even know what

24  her process was.  You know, I just know that, you know, I make

25  sure that there is probable cause in it.  And once I give it to

*Judge Steven L. Shaffer - Direct Examination (Ms. Crockett)*

1  the officers, that's usually the last I hear of it unless it
2  comes back before me.
3  Q.   Okay.  And you included in your affidavit that, then --
4  consistent with your statement, I think, just now -- for
5  reasons unknown to you, a search warrant is not in that file.
6  A.   Yeah.  I mean, I don't have -- once the officer -- once I
7  hand things back to the officer, that's my last involvement
8  with it.
9  Q.   Okay.
10         MS. CROCKETT:  Your Honor, that's all I have.  I
11  would move the admission of the affidavit if the Court thinks
12  it's necessary.  I don't think it's necessary.  He's testified
13  consistent with it.
14         THE COURT:  Right.
15         MS. CROCKETT:  But I know the Court has it attached
16  to the pleadings.  And so, for that purpose, I guess I'd move
17  its admission.
18         THE COURT:  Understood.  It's already in the record
19  attached to the papers.
20     Cross?
21         MR. SHEEHAN:  A little.
22     Judge, I'm going to do it from here because of the
23  microphone.
24         THE COURT:  Yes.  Please.  Thank you, Mr. Sheehan.
25

*Judge Steven L. Shaffer - Cross-Examination (Mr. Sheehan)*

<u>CROSS-EXAMINATION</u>

BY MR. SHEEHAN:

Q.   Judge Shaffer, my name Martin Sheehan.  I represent Mr. Seeger in the federal proceedings.

     Sir, do you have a copy of the affidavit for search warrant with you at this time?

A.   I think it's over in my cabinet if you want me to grab it.

Q.   If you would, sir.

A.   Okay.  Hang on there just one second.

     Okay.  I have it right here.

Q.   Sir, typically in a search warrant itself, the search warrant document -- and certainly on the preprinted form that exists -- there is language that says -- and I'm really summarizing a lot -- it says go do a search.

     Do you find any language in the affidavit for search warrant that you have in front of you that contains any language that directs the officer to conduct a search?

A.   May I look at it, sir?

Q.   Sure.

A.   Okay.  Thank you very much.

     The only thing that I see in reference to that, sir, is the -- on page number 2 that says, "Based on the above information, Trooper Nicholson has cause to believe and does believe that evidence of this crime are possessed within the above-described residence and the affiant requests a search

*Judge Steven L. Shaffer - Cross-Examination (Mr. Sheehan)*

1  warrant be issued to said residence."

2  Q.   Okay.  There is no order language saying "Go do that."  Is

3  that correct, sir?

4  A.   I don't see any language telling him to go do that.

5  Q.   Okay.  And that language would typically be part of a

6  search warrant form; is that correct, sir?

7  A.   Are you talking about in a regular search warrant?

8  Q.   Yes, sir.

9  A.   Well, most of them come about on preprinted forms.

10  Q.   Yes, sir.  And if I were to show you the preprinted form,

11  I think I have some language I could read to you.  But I'll --

12  I don't have that in front of me.

13  A.   I am familiar with it.  And basically what they'll

14  normally say is that the officer is commanded to go search

15  these premises.  And I'm paraphrasing.  I can't give you the

16  exact language.  But I can tell you --

17  Q.   Sir, I'm going to suggest some language to you.

18       "You are therefore commanded in the name of the State of

19  West Virginia to search forthwith the premises above-described

20  and all appurtenances appertaining thereto for the property

21  above-specified to seize such property and to bring the same

22  before me to be dealt with according to law."

23       Is that the kind of language that you -- that I -- that

24  you would recognize as an order to conduct a search?

25  A.   That is -- that is either the language or very similar

*Judge Steven L. Shaffer - Cross-Examination (Mr. Sheehan)*

1  language that would be in the search warrant.

2  Q.   Okay.  Sir, did you -- I think you said that you

3  ultimately -- there was an expungement issued in the matters

4  pertaining to Mr. Seeger.  Is that correct?

5  A.   Yes, sir.

6  Q.   And do you -- have you reviewed the expungement order that

7  was issued with -- relevant to Mr. Seeger?

8  A.   I have probably not looked at that since the order was

9  signed, sir.

10  Q.   Okay.  That would have been assigned a "P" number in the

11  state court system?  "P" is typically for miscellaneous

12  matters; is that correct?

13  A.   It would have -- if the case had been dismissed prior to

14  the expungement request, then yes, it would have been in a P

15  case.

16  Q.   Okay.  Are you familiar with whether or not there is an

17  expungement order in a case numbered 23-P-36, titled

18  "Expungement of Record of Steven David Seeger"?

19  A.   I -- you said records were expunged.  So there would have

20  to be an order for that.

21  Q.   Okay.  And for the record to be expunged, typically what

22  that order would say is that the record is expunged and sealed

23  and is of no further effect; is that correct?

24  A.   That's usually what it says, yes.

25  Q.   Okay.  And that doesn't mean the documents would be

*Judge Steven L. Shaffer - Cross-Examination (Mr. Sheehan)*

1  destroyed at the courthouse.  That means the documents -- that

2  law enforcement agencies are supposed to report that they've

3  destroyed some records; but ultimately, the clerk would

4  retain -- be the repository of the records as they originally

5  existed.  Is that correct, sir?

6  A.    Yes.  Ms. Leishman should have maintained the records,

7  yes.

8  Q.    Okay.

9        MR. SHEEHAN:  Anything else?

10       (Pause in proceedings.)

11  BY MR. SHEEHAN:

12  Q.    Oh.  When you are issuing a search warrant, is it your

13  understanding that it's your oblig- -- that it's the function

14  of the court to determine if the police officer who's seeking

15  the warrant has supplied you enough information to believe that

16  someone who has supplied him information has been fully

17  truthful and is credible?

18  A.    Yes.  Yes, sir.  I believe I testified to that earlier;

19  that, you know, when I swear the person, that it's based on

20  actual knowledge or, if it's provided information from another

21  person, that they found that source to be credible.

22  Q.    And do you have any specific recollection of the issuance

23  of the -- of the -- the event which led to the signing of the

24  affidavit that was presented to you by Trooper Nicholson in

25  this instance?  Or are you just testifying from pattern and

*Judge Steven L. Shaffer - Redirect Examination (Ms. Crockett)*

1    practice of what you do as a judge?

2    A.    Sir, I'm just -- I'm just testifying as to my procedure

3    that I use.  Like I said, if Trooper Nicholson walked in my

4    office right now, I would not even be able to recognize him.  I

5    don't -- you know, and I really wouldn't.  I mean, that's just

6    that simple.  That's -- you know, yeah.  And, I mean -- I mean,

7    what was that?  In 20- -- 2021?

8    Q.    Yes, sir.  I don't expect you to remember.  I'm confirming

9    that you don't.

10   A.    Yeah.  No.  I have no -- I have no recollection of that

11   specific event at all, sir.

12   Q.    Thank you.

13          MR. SHEEHAN:  I have no further questions, Your

14   Honor.

15          THE COURT:  Any --

16          JUDGE SHAFFER:  Okay.

17          THE COURT:  One second, Judge Shaffer.  Thank you.

18     Any redirect?

19          MS. CROCKETT:  Just one question, Your Honor.  Always

20   one.

21                    REDIRECT EXAMINATION

22   BY MS. CROCKETT:

23   Q.    Judge Shaffer, then, understanding that you're just

24   testifying from your general knowledge, your -- your

25   recognition of your signature upon the affidavit, would that

*Judge Steven L. Shaffer - Redirect Examination (Ms. Crockett)*

1  confirm for you that you found probable cause for the search to

2  occur?

3  A.   Oh, yes.  If I would not have found probable cause, I

4  would have rejected the search warrant.

5  Q.   And so an officer who would have retrieved your signature

6  on an affidavit would have been authorized, according to your

7  procedure, to execute a search.

8  A.   There should have been a search warrant with it.  I don't

9  know what has happened to it.

10            MS. CROCKETT:  Okay.  Thank you.

11            THE COURT:  Recross?

12            MR. SHEEHAN:  No recross, Your Honor.

13            THE COURT:  Judge Shaffer, thank you so very much for

14  letting us intrude in your day.  I know you had a busy docket.

15  We really appreciate your time and your help, sir.

16            JUDGE SHAFFER:  Okay.  Yeah.  No, no.  We're -- I'm

17  going to head back in.  We're still on -- we're still going

18  strong here, probably for another -- at least another

19  45 minutes or better.

20            THE COURT:  All right, sir.

21            MR. SHEEHAN:  Your Honor.

22            THE COURT:  Yes.

23            MR. SHEEHAN:  Before he gets off the phone.  We will

24  not call the clerk.  And if he would like to advise her, that's

25  fine with us.

 1              JUDGE SHAFFER:  All right.

 2              THE COURT:  Judge, if I can keep you on the federal

 3     payroll, if you wouldn't mind letting your circuit clerk know

 4     that she's not going to be called as a witness now.

 5              JUDGE SHAFFER:  Okay.  Yes.  I can let her know

 6     Ms. Leishman is not going to be called.

 7              THE COURT:  That is correct, sir.

 8              JUDGE SHAFFER:  Okay.  I will have my office go

 9     straight down and tell her.

10              THE COURT:  All right.  Thank you so very much,

11     Judge.  Have a wonderful day.

12              JUDGE SHAFFER:  All right.  Thank you guys very much.

13              THE COURT:  Thank you.

14              JUDGE SHAFFER:  Bye-bye.

15              THE COURT:  All right.  Can you all be here at 10:00

16     tomorrow morning?

17              MR. SHEEHAN:  Yes, sir.

18              MS. CROCKETT:  Yes.

19              MR. DYER:  Yes, sir.

20              THE COURT:  All right.  Can your witnesses be here at

21     10:00 tomorrow morning?

22              MS. CROCKETT:  Yes.  Uh-huh.

23              THE COURT:  What about Mr. Lee?  He's all the way

24     here from the great state of Texas.

25              MS. CROCKETT:  Oh.  Mr. Lee flies out --

1          MR. SALEM:  Do you -- you don't have any other use

2    for him?

3          MS. CROCKETT:  Just the call.

4          MR. SALEM:  Your Honor, I think we'll be able to

5    continue the other motions without him.  So...

6          THE COURT:  Okay.  All right.

7          MS. CROCKETT:  Thank you.

8          THE COURT:  We're going to stand in recess until

9    10:00 AM tomorrow morning.  We'll pick up from there, and the

10   Government can call its next witness.  And then the defense can

11   call whomever.

12         MS. CROCKETT:  Your Honor.

13         THE COURT:  Uh-huh.

14         MS. CROCKETT:  A matter unrelated to this.  I was

15   charged with bringing the Court binders for another matter it

16   has, and went to the office and did not see the binders.  But

17   my understanding is that they were there for me.  So I will

18   bring them to the Court tomorrow.  But the fact that they will

19   be delayed a day is attributed to me.

20         THE COURT:  I can't imagine I was going to read those

21   this evening, Ms. Crockett.

22         MS. CROCKETT:  Okay.

23         THE COURT:  If I was, that's news to me.

24         MS. CROCKETT:  Okay.  All right.

25         THE COURT:  I'm going to a middle school softball

1    game instead.

2          MS. CROCKETT:  Oh, nice.  Okay.

3          THE COURT:  So I'm not going to be reading those

4    there.

5        We'll see you all tomorrow morning at 10:00 AM.  We'll

6    pick up from there.  Thank you all very much.

7        (Proceedings adjourned at 5:05 PM.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                              CERTIFICATE

 2

 3       I, Rachel Kocher, a Registered Merit Reporter and Official

 4   Reporter of the United States District Court for the Northern

 5   District of West Virginia, do hereby certify that the foregoing

 6   is a true and correct transcript of the proceedings had in the

 7   above-styled action as reported by me stenographically, all to

 8   the best of my skill and ability.

 9       I certify that the transcript fees and format comply with

10   those prescribed by the Court and the Judicial Conference of

11   the United States.

12       Given under my hand this 6th day of June 2025.

13

14

15                              *Rachel Kocher*
                                _____
16                              Rachel Kocher, RMR, CRR

17

18

19

20

21

22

23

24

25