```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
 2                        AT CLARKSBURG

 3   ------------------------------x
     UNITED STATES OF AMERICA,      :
 4                                  :
          Plaintiff,                :
 5                                  : CRIMINAL ACTION NUMBER:
       vs.                          : 1:24-CR-42
 6                                  :
     STEVEN DAVID SEEGER,           :
 7                                  :
          Defendant.                :
 8   ------------------------------x

 9        Proceedings had in the continued pretrial conference and
     motions hearing of the above-styled action on April 15, 2025,
10   before the Honorable Thomas S. Kleeh, Chief District Judge.

11   APPEARANCES:

12   FOR THE UNITED STATES OF AMERICA:

13       Kimberley D. Crockett, Esq.
         Daniel Lee Salem, Esq.
14       U.S. Attorney's Office
         217 W. King Street, Suite 400
15       Martinsburg, WV 25401
         kimberley.d.crockett@usdoj.gov
16       daniel.salem@usdoj.gov

17   FOR THE DEFENDANT:

18       Thomas G. Dyer, Esq.
         Dyer Law Offices
19       P.O. Box 1332
         Clarksburg, WV 26302-1332
20       dyerlawof@aol.com

21       Martin P. Sheehan, Esq.
         Sheehan & Associates, PLLC
22       1140 Main Street, Suite 333
         Wheeling, WV 26003
23       martin@msheehanlaw.net

24   The Defendant was present in person.

25   Proceedings recorded by mechanical stenography.
     Transcript produced by computer-aided transcription.
```

1                        W I T N E S S E S

2                                                              PAGE

3    **EDWARD RYAN**

4    Direct Examination by Mr. Sheehan                          3

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*E. Ryan - Direct Examination (Mr. Sheehan)*

1                           Tuesday, April 15, 2025, 10:03 AM

2                                   - - -

3           THE COURT:  We convene for a continuation of

4    yesterday and our evidentiary hearing in U.S. v. Seeger.

5    Counsel is present.  Mr. Seeger is present as well.

6        Any additional witnesses the Government --

7           MS. CROCKETT:  No, Your Honor.

8           THE COURT:  -- would like to call?

9           MS. CROCKETT:  No.

10          THE COURT:  No?  All right.

11          MS. CROCKETT:  We're not going to call any other

12   witnesses.

13          THE COURT:  Any from the defense?

14          MR. SHEEHAN:  We would call Agent Ryan briefly, Your

15   Honor.

16          THE COURT:  Understood.

17      Sir, can I ask you to step forward?  Thank you.  Madam

18   Clerk will swear you in.  Then we'll ask you to take the

19   witness stand.  Thank you so much.

20          (EDWARD RYAN, GOVERNMENT'S WITNESS, SWORN)

21          THE CLERK:  Thank you.  If you'd please have a seat

22   here in the witness stand.

23                      <u>DIRECT EXAMINATION</u>

24   BY MR. SHEEHAN:

25   Q.  Would you tell us your name, please.

*E. Ryan - Direct Examination (Mr. Sheehan)*

1   A.   Edward Ryan.

2   Q.   And your occupation.

3   A.   I'm an FBI agent.

4   Q.   And you've been generally assigned to do the investigation

5   that's led to the indictment of Mr. Seeger.  Is that fair to

6   say, sir?

7   A.   Yes, sir.

8   Q.   The person that we've referred to as K.S. is the person

9   that came forward to the police in Texas and then ultimately

10  was known to the state trooper who testified yesterday.

11  A.   Yes.

12  Q.   Okay.  The other person that we referred to as being by

13  her initials -- and I've forgotten, quite honestly, what they

14  are.  I know they're not K.S., so I'll leave it at that.  How

15  was that --

16          THE COURT:  Well, what initials did we settle on for

17  Jane Doe Number 2?

18          MS. CROCKETT:  Jane Doe Number 2 is K.S.

19          THE COURT:  Okay.  And Jane Doe Number 1, then?

20          MS. CROCKETT:  P.G.

21          THE COURT:  "P.G."  Okay.  All right.

22          MR. SHEEHAN:  So --

23          THE COURT:  Sorry, Mr. Sheehan.  Go ahead.

24          MR. SHEEHAN:  Thank you, Your Honor.

25

*E. Ryan - Direct Examination (Mr. Sheehan)*

1  BY MR. SHEEHAN:

2  Q.    How was P.G. identified, sir?

3  A.    P.G. was identified through a text message that contained

4  a CSAM image.

5  Q.    And was -- where was that text message recovered from?

6  A.    From Mr. Seeger's LG Nexus phone.

7  Q.    So from the material that was seized in the warrant that

8  was obtained from -- or in the search that was conducted by

9  Trooper Nicholson.

10  A.    Yes.

11  Q.    All right.  So without that information, you would not

12  have learned the identity of P.G.  Is that correct, sir?

13  A.    That's correct.

14        MR. SHEEHAN:  That's all I have, Your Honor.  Thank

15  you.

16        THE COURT:  Understood.

17     Any cross?

18        MS. CROCKETT:  Just one second, Your Honor, if you

19  would.

20     (Pause in proceedings.)

21        MS. CROCKETT:  Okay.  I don't have anything, Your

22  Honor.

23        THE COURT:  All right.  Special agent, thank you,

24  sir.  You can step down.

25        THE WITNESS:  Thank you, sir.

```
 1                THE COURT:  Thank you.

 2         Any other witness from the -- excuse me -- witnesses from

 3   the defense?

 4                MR. SHEEHAN:  No, Your Honor.

 5                THE COURT:  Okay.  All right.  I guess, technically,

 6   it's your motion, Mr. Sheehan, Mr. Dyer.  So go ahead on the

 7   suppression issue.  And I've read everything the parties have

 8   briefed, but there are a few things I want to talk through.

 9                MR. SHEEHAN:  Yes, sir.  I've prepared some thoughts.

10                THE COURT:  And if you're more comfortable seated,

11   sir.

12                MR. SHEEHAN:  I fell going to visit Mr. Seeger in

13   January, Judge.  And transitioning from standing to sitting and

14   sitting to standing is my problem.

15                THE COURT:  Okay.

16                MR. SHEEHAN:  It is not actually being on my feet.

17   So I --

18                THE COURT:  Okay.  All right.

19                MR. SHEEHAN:  But I appreciate you --

20                THE COURT:  No.  Wherever you're more comfortable.

21                MR. SHEEHAN:  Yeah.  The -- if Mr. Dyer wasn't there,

22   I would not have a good witness as to my clumsiness on the ice.

23                THE COURT:  Your workers' comp claim?

24                MR. SHEEHAN:  I haven't made a claim, Judge.  I don't

25   expect to.  But I'm optimistic I will recover in a way that
```

1  makes my life more tolerable.

2      Judge, it is our motion, and so we have an initial burden

3  to establish standing.

4          THE COURT:  Right.

5          MR. SHEEHAN:  I think, very briefly, yesterday

6  Trooper Nicholson said that he was aware, had done some

7  pre-investigation to establish that 310 Hilltop was, in fact,

8  Mr. Seeger's residence.  I think that is all that we really

9  need to do to establish standing.

10     The complicated part of this case, the issue I raised with

11 the Court yesterday as we started, has to do with there are

12 different evidentiary rules that apply to your analysis of this

13 case if it's a search pursuant to a warrant --

14         THE COURT:  Uh-huh.

15         MR. SHEEHAN:  -- or if there's no warrant.

16         THE COURT:  Right.

17         MR. SHEEHAN:  And so the case law indicates that you

18 can either determine a warrant -- a valid warrant is a valid

19 warrant, or you could skip that step and go to good faith as a

20 rule.

21         THE COURT:  And I have an initial question.

22         MR. SHEEHAN:  Yes, sir.

23         THE COURT:  And Ms. Crockett, I'll give you a chance

24 to speak to this question too.

25     Can I, if there is no warrant?

1          MR. SHEEHAN:  That is the magic question, Judge, that
2    I've looked at for a long time.  And I do not believe that you
3    can get to good faith if there's no warrant.  I've looked at
4    this a good deal.
5          THE COURT:  And if I could.  And I apologize for
6    interrupting in your chain of thought -- train of thought.
7    Geez.
8          I guess my question has a couple layers to it.  Because
9    there is no physical warrant.  Okay?  We have the affidavit;
10   that the testimony is clear between Judge Shaffer and Trooper
11   Nicholson that there was an affidavit that both Trooper
12   Nicholson and Judge Shaffer signed and it -- and, certainly,
13   all the testimony about Judge Shaffer's practice when warrants
14   are presented -- warrant applications are presented to him for
15   consideration, et cetera.
16         So there's no physical warrant.  There is evidence in the
17   record that, arguably, the Court could infer that the warrant
18   existed at that point in time and it has just been lost in the
19   shuffle.  And so I guess my question is, first, if that is the
20   scenario or if that's the conclusion the Court draws from the
21   record before it, can the Court, if necessary, proceed to a
22   good faith *Leon* analysis?
23         Or in the alternative, there simply was never a warrant.
24   There was an affidavit that was presented to the Judge, that
25   both Trooper Nicholson and Judge Shaffer signed; but for

1   whatever reason, there simply was never a warrant.  And in that
2   scenario, can the Court undertake a good faith analysis?  I'll
3   give you a chance to hammer off of the tee I've set up on both
4   sides, Mr. Sheehan.

5           MR. SHEEHAN:  Yes.  I've prepared some remarks that I
6   hope will answer that.  And I'm going to go through that in
7   that order, because I have spent a lot of time trying to
8   organize my thoughts to address those issues --

9           THE COURT:  Okay.

10          MR. SHEEHAN:  -- seriatim for you.

11      Historically when we looked at a valid -- a warrant in
12  terms of its validity, we looked at the four corners of the
13  warrant.

14          THE COURT:  Right.

15          MR. SHEEHAN:  That's easy.

16      When there's a technical issue with the warrant, then
17  we've allowed good faith.  And the best example of a good faith
18  problem is one that's been raised in this case and is addressed
19  by a Fourth Circuit case called *United States v. Thomas*.  And
20  that is the problem with linking the address to Mr. Seeger's
21  conduct.  *Thomas* says there's -- if there's a warrant, then you
22  can jump that gap because the officer testified he had that
23  information.  If you -- and so that whole issue of is there a
24  warrant or isn't there a warrant has a significant evidentiary
25  effect.

1          Now, the Government has cited a couple of cases.  I recall
2    one from the Tenth Circuit where people appeared at a
3    magistrate's office, presented a lot of documents, apparently
4    had the warrant with them, and it never got signed.  So they
5    went out and did the search, and they came back.  They asked
6    the judge to sign the warrant after the fact.  He acknowledged
7    that he was going to do so, indicated he was signing it after
8    the fact, wasn't sure what the rules were, and the Tenth
9    Circuit ultimately affirmed that situation.
10         There's a similar case in another circuit.  They're both
11   2014 cases.  But the interesting thing in those two cases, from
12   my perspective, was that the Court said that signing a warrant
13   was not a requirement of the rules.  And I was a little
14   shocked.  So I went back and looked at both the state Rule of
15   Criminal Procedure 41 and Federal Rule of Criminal Procedure
16   41, and that analysis is correct.  But both of those rules
17   require that there be a warrant.
18              THE COURT:  Right.
19              MR. SHEEHAN:  More importantly, the Fourth Amendment
20   requires that a warrant issue on probable cause.  And I believe
21   that if we're looking at the practice in 1792, when the Fourth
22   Amendment was adopted, that the historical record would be
23   there's a piece of paper that is a warrant.
24         And so I am troubled by the ability to forgo the warrant
25   requirement and make a guess, as well as -- as well intentioned

```
 1   as the officer may have been.  And I would have to concede I
 2   think that he was well intentioned trying to get a warrant.
 3   But I don't think he did.  And I -- and so he knew --
 4           THE COURT:  Well, what the Government is going to
 5   say, presumably, is that vein of argument is a form over
 6   substance argument.
 7       And I realize my initial questions to you, Mr. Sheehan,
 8   were form over substance of -- because, like you, the complete
 9   absence of an actual warrant is of grave concern.  Because
10   respectfully, whatever circuits have said whatever, the Fourth
11   Amendment itself has the "W" word in it; right?
12           MR. SHEEHAN:  Yes, sir.  Yes, sir.
13           THE COURT:  And then from there flows all this other
14   analysis.  So -- I'm inclined to believe there is some weight
15   behind the form over substance argument; but then, of course,
16   comes Leon.
17           MR. SHEEHAN:  Well, and at the end of the day, as I
18   make this presentation, I do want to address Leon and its
19   context and its historical stuff in the particular context of
20   where we are.  So I'm going to defer your discussion unless you
21   want me to address it now.  I'll be happy to do so --
22           THE COURT:  No.  That's okay.  Go ahead.
23           MR. SHEEHAN:  -- in any order that you want, Judge.
24           THE COURT:  I'm merely throwing my thoughts out as
25   they come so that we check all the boxes that I...
```

1          MR. SHEEHAN:  Oh, I'm happy to do so.  I -- as a

2    young lawyer, and as an old one, I have -- it is my

3    understanding that my obligation is to answer the Court's

4    questions as they are put, Judge.

5          The -- I want to emphasize whether there was or wasn't a

6    warrant.  Because what the trooper said yesterday was he knew

7    he needed two documents: the affidavit and another document.

8    And so we talked about the two documents.  And at some point he

9    said, "I thought I would get the second document when I went

10   over to court."  I think the practice actually has been is that

11   the requesting officer prepares both documents --

12          THE COURT:  Right.

13          MR. SHEEHAN:  -- and brings them both over.  That --

14   anyway.  But I understand how he could have been somewhat

15   confused.

16          Judge Shaffer was equally clear, I think, that there

17   needed to be two documents.  You know there needs to be two

18   documents.  There is some theoretical possibility I'll give out

19   that an affidavit could also be a warrant if it had a lot of

20   language in it.

21          THE COURT:  Right.

22          MR. SHEEHAN:  But that's not the situation here.  So

23   the two-document requirement makes me believe fairly clearly

24   that there was no -- there wasn't a warrant, sir.

25          Now, the suggestion has been made that the document was

1    somehow lost in the expungement process.  And I -- we spent

2    some time examining that before we got here.  And in the

3    expungement -- and I went through this language with Judge

4    Shaffer yesterday.  And obviously, he wasn't necessarily

5    looking at the order.  But he did understand that what happens

6    in an expungement is that you tell police agencies to destroy

7    their files.

8            THE COURT:  Right.

9            MR. SHEEHAN:  But the court maintains a file under

10   seal, and that file should be fully available.  In examining

11   that aspect of it, if there was a warrant, it should have been

12   lodged there.  The West Virginia Rule of Criminal Procedure

13   says -- and the subparagraphs are slightly different in state

14   and federal law.  It says that the clerk should possess all

15   those documents after the fact.

16       And so the fact that the clerk doesn't have those

17   documents is of -- has really led us to the conclusion that

18   there never was a warrant in this case.  And so that's where I

19   think I come up factually, and that leads to various

20   conclusions.

21       Now -- okay.

22       Now, it is pretty clear to me that -- and I spent a lot of

23   time thinking about this.  Because the *Leon* case, and then

24   later some Fourth Circuit cases that incorporate this language,

25   say that you don't -- you can't use good faith if there's a

 1    *Franks* issue --

 2              THE COURT:  Right.

 3              MR. SHEEHAN:  -- in a case.  And so I started to

 4    actually explore the issue of whether there could be a *Franks*

 5    issue, but it could be saved on other grounds, and whether

 6    there was some hybrid between good faith sometimes.  And

 7    ultimately, after spending a lot of time thinking about that,

 8    Judge, I think the answer to that question is no.  I think that

 9    if there's a *Franks* issue, it's out.  We can't get to good

10    faith --

11              THE COURT:  Uh-huh.

12              MR. SHEEHAN:  -- because of the -- I think, really,

13    the lack of good faith by the officer is reflected in the fact

14    that he wasn't candid in a way that he needed to be.

15              THE COURT:  But has the defense made the requisite

16    showing to get to the point where we have a *Franks*

17    conversation.

18              MR. SHEEHAN:  I think --

19              THE COURT:  Not a frank conversation, but a *Franks*,

20    capital F with an S --

21              MR. SHEEHAN:  No, no.  I followed you, sir.

22              THE COURT:  -- conversation.

23         No.  It's --

24         Yeah, okay.  I was just making sure --

25              MR. SHEEHAN:  For the record?  Yes, sir.

1              THE COURT:  -- the court reporter got that.

2              MR. SHEEHAN:  Yeah.  The -- but what we know is that

3    the police officer wrote a report.  While we didn't put the

4    report in yesterday, Mr. -- my co-counsel, whose name --

5              THE COURT:  Dyer.

6              MR. SHEEHAN:  Mr. Dyer.  Thank you, Judge.

7              THE COURT:  I'm very familiar with him.

8              MR. SHEEHAN:  -- has cross-examined the officer about

9    what he knew about the girl's candor.  And basically, he got

10   the information out of him that was in the report, which is

11   that he had received some information from the Nacogdoches

12   police officer that was negative as to her credibility.

13       Now, the -- I assume they called the police officer of

14   Nacogdoches yesterday to say that that error, that lack of

15   credibility runs in my client's favor, and so it wasn't a

16   problem to make the disclosure.  I'm not really sure why they

17   called him other than that.

18       But he said that she was -- he thought she had a lack of

19   candor based on her body language versus what she said.  And so

20   if you -- if you assume that that sort of ran in my client's

21   favor, I understand how the Government makes that argument.

22   But the difficulty, Judge, is that once you are not truthful or

23   you're not candid across the board -- I mean, we typically give

24   jurors an instruction that if you're false in one thing, you're

25   false in many -- you could be false in many things.  And while

1  that's not an -- it's an inference that's drawable, it's not an

2  inference that's required.

3      But I do think that because there's an issue with her

4  credibility and because there was no effort to address it at

5  all -- I mean, had the officer taken --

6          THE COURT:  Well, Trooper Nicholson interviewed the

7  alleged victim at that point; right?

8          MR. SHEEHAN:  Yes.

9          THE COURT:  After this report from Officer Lee.

10          MR. SHEEHAN:  Yes, he did, Judge.

11          THE COURT:  And he made his own assessment about her

12  as a potential witness, complainant, whatever title she should

13  have had at that point in time; right?  That -- that was --

14  that was what I took from the testimony of yesterday.

15          MR. SHEEHAN:  Yes, he did.

16          THE COURT:  Okay.

17          MR. SHEEHAN:  But I still think that because he

18  bothered to write in the report, his own report --

19          THE COURT:  Absolutely.

20          MR. SHEEHAN:  And I'm going to say that if you take

21  those two paragraphs out of his report --

22          THE COURT:  Uh-huh.

23          MR. SHEEHAN:  -- and they were in a proper affidavit

24  and then there's a warrant issued, then a judge -- if Judge

25  Shaffer had then concluded that there was no problem with him

1   issuing a warrant despite the disclosed lack of credibility,

2   then I think that -- I am actually confident that I wouldn't

3   have an issue here at all.  That would be un- -- something I

4   could not get into.

5             THE COURT:  Right.

6             MR. SHEEHAN:  It would never make a *Franks* issue.

7   And so -- and that kind of disclosure is the attaboy on the

8   good faith of the officer for having, I'm going to say, thrown

9   up or fully disgorge the information at his hand.  And that he

10  did not do in this case.  And I think that that gets us to the

11  *Franks* issue in this case.  All right.

12            THE COURT:  And I just want to make sure I've got it,

13  counsel.  That is your belief of the substantial showing

14  required to unlock the next steps of a *Franks* analysis.

15            MR. SHEEHAN:  Yes, sir.

16            THE COURT:  Okay.

17            MR. SHEEHAN:  It's also true in this particular case

18  that the warrant information is stale.  The offi- -- the young

19  lady who was giving information in 2021 was 21 years old.  She

20  was talking about information that was substantially in the

21  past; at a minimum, it was while she was a minor.  So it's

22  three years earlier, okay, when she was -- just before her

23  18th birthday.

24      The reality is that if you look at the warrant -- I'm

25  going to call it the digital warrant -- issued subsequently in

1  Preston County, the complaint there is that Mr. Seeger

2  committed a violation in 2014.

3      So, arguably, now we're talking about pictures that are as

4  much as seven years old.  Okay?  And in which she said to the

5  officer that she didn't know if Seeger had any such documents,

6  if he'd kept any of those documents.  And so all of that

7  underlies whether there really would be probable cause to do

8  so.  All of that has to rest on the affidavit language that

9  says, "It's my experience as an officer that people keep stuff

10  and keep it for long periods of time."

11      I'm not sure that that's enough.  I do think that it's

12  a -- it raises a staleness issue that is pretty significant.

13      There's the address problem.  And if there's no good -- if

14  you don't get to good faith, you can't solve that problem under

15  *Thomas*.

16          THE COURT:  Explain to me what you mean by the

17  address problem.

18          MR. SHEEHAN:  Oh.  He asked for a warrant to search

19  310 Hilltop Drive.

20          THE COURT:  Okay.

21          MR. SHEEHAN:  Nowhere in the affidavit does it say

22  that that is Mr. Seeger's residence.

23          THE COURT:  Okay.

24          MR. SHEEHAN:  And so the only reason to search

25  310 Hilltop Drive would be if that had some nexus to Mr. Seeger

 1  that was outlined in the four corners of the affidavit.

 2      And so in the *Thomas* case, where they say you can solve

 3  that problem with good faith, they also seem to say to me that

 4  that is a historical defect in the issuance of a warrant.  And

 5  so the case supports my analysis of this defect.  The case says

 6  to me I don't get any relief if there's good faith.  And so I

 7  have to -- there's some path in there where, if there is no

 8  good faith, then it, in fact, is a defect.  Okay.

 9      Trooper Nicholson then divides his search -- he talked

10  about the physical search.  And in this regard I think he was

11  referring to seizing the six electronic devices he ended up

12  seizing.  Then he talks about getting a warrant to do the

13  search of that material for its digital content.

14      Pretty clearly, if the search that allowed the securing of

15  those six electronic devices is defective, then the search for

16  the digital information is fruit of the poisonous tree.

17          THE COURT:  Right, right, right.

18          MR. SHEEHAN:  We don't really need to do a lot of

19  analysis of the second warrant.  But I do want to say --

20      And I was a little surprised by the officer's testimony.

21  Because we have questioned whether he could get a warrant in

22  Preston County to actually search material in Monongalia

23  County.  Now, his explanation was that he repossessed those six

24  items in Preston County from the evidence locker.

25          THE COURT:  Uh-huh.

```
 1              MR. SHEEHAN:  That's not a search.  And in fact, he
 2    couldn't do the search.  I mean, he needed the technical
 3    experience of the people in Morgantown --
 4              THE COURT:  Right.  To do the --
 5              MR. SHEEHAN:  -- which is in Mon County, to actually
 6    do the search.
 7              THE COURT:  -- data extraction.  Right.
 8              MR. SHEEHAN:  Right.  And so we think that the
 9    warrant to do the extraction should have been issued in
10    Monongalia County and that that is, again, a flub-up in this
11    particular case.
12              THE COURT:  Okay.
13              MR. SHEEHAN:  The -- I will say this.  Pretty
14    clearly, the Court knows this.  The court in Preston County has
15    no jurisdiction to order anything to be done outside the
16    county.
17         The information search was delayed.  The digital search
18    was delayed.  We believe that's a problem.  My client was
19    entitled to get his data back if it wasn't properly seized and
20    to do that promptly.  And the delay in executing that -- the
21    digital search was a problem.
22         Now, I do -- I was a little surprised, and this threw me
23    off.
24              THE COURT:  The delay in the digital search.  How --
25              MR. SHEEHAN:  It's about -- it's about -- the
```

1    materials are seized on March 29.

2             THE COURT:  Uh-huh.

3             MR. SHEEHAN:  And I think the digital search is

4    April 19th.  So it's a 20-day delay before they get around to

5    doing the next step of their investigation.

6             THE COURT:  Okay.

7             MR. SHEEHAN:  And that is some deprivation of my

8    client's possessory --

9             THE COURT:  But how does that rise to the level that

10   requires this Court to exercise its authority to provide a

11   remedy under the Fourth Amendment?

12            MR. SHEEHAN:  We think that the withholding of that

13   information is a -- it's an independent Fourth Amendment

14   violation, Judge.

15            THE COURT:  Okay.

16            MR. SHEEHAN:  All right.  The other thing that

17   surprised me that Officer Nicholson said, he did not seize all

18   the electronic devices that were called for to be seized in the

19   warrant.

20       Now, again, this is one of those odd things to say.  But

21   the officer did not do what he thought the warrant commanded

22   him to do, which is to seize all the electronic devices on

23   site.  Now, arguably, that cut in my favor, because he didn't

24   take a device.  But at the same time, to me, it represents a

25   flouting of what he thought was court authority.  Because a

 1  warrant says go do stuff.  The reason we distinguish general

 2  warrants from valid warrants --

 3              THE COURT:  Constitutional warrants.

 4           MR. SHEEHAN:  -- valid warrants --

 5              THE COURT:  Right.

 6           MR. SHEEHAN:  -- is that we do not leave to the

 7  discretion of the officer what to take.

 8       And so here the officer I think was exercising discretion

 9  that it was not his to exercise, and I think that that is a

10  problem that impacts the viewing of good faith in this

11  particular case.

12              THE COURT:  Sure.

13           MR. SHEEHAN:  Now, the question that you have

14  really -- I think is at the heart of your concerns is where are

15  we with the lack of a warrant and the whole thing and how does

16  this relate to *Leon*?  And I think I may be the only lawyer in

17  the room who practiced before *Leon* was the law.  It is a long

18  time ago, and I have lived with that for a long time.  I was

19  chatting about that with Mr. Dyer, and he confirmed that he had

20  come to practice somewhat afterwards.

21       And so the -- in 1983, the -- I'm -- I -- this case is a

22  winner for the defense.  In 1984, *Leon* changes the character.

23  And basically what *Leon* says is that -- we were trying to stop

24  use of the exclusionary rule where the police officers made

25  technical mistakes.  Okay?  And so, like I said, the address

1    issue, a technical kind of mistake.  It's a very simple one to

2    define.

3         But in this particular case, if you're trying to -- the

4    theory behind the exclusionary rule was that we're going to

5    exclude evidence in order to make the police better educated

6    moment by moment so that, ultimately, we understand how the law

7    works and they do a better job.

8              THE COURT:  Uh-huh.

9              MR. SHEEHAN:  If, in this case, you were to say,

10   yeah, you thought about getting a warrant; you didn't really

11   get one; it sort of says this; you executed it in part; you

12   really -- there's some staleness issues, and we're going to

13   overlook all that and still find good faith, then, Judge, I

14   think we have used the good faith exception to really

15   eviscerate everything that's left in the Fourth Amendment.  And

16   so that is --

17             THE COURT:  There are some law review articles that

18   take the same position.

19             MR. SHEEHAN:  And so -- well, this is -- I have to

20   say I've been practicing a long time.  Mr. Dyer and I talked

21   about this at some length.  And while we have a good bit of

22   experience before the -- for the bar, this is one of the more

23   extreme problems with a search that I've ever encountered.  And

24   I --

25        You know, there's no warrant.  And then we've started to

```
 1   articulate some difficulty.  And so that -- all in all, that
 2   gives me great pause.
 3       I know you can't do this.  But if I don't ask, I can't ask
 4   a higher court later.
 5             THE COURT:  Understood.
 6             MR. SHEEHAN:  So, Judge, I would suggest that if
 7   that's going to be the outcome under Leon, then Leon itself
 8   needs to be revisited.  I know you appreciate exactly why I've
 9   made those comments and the other comments that preceded it.
10   And so that's really where I am.
11       If there's other questions you have, Judge, I'm happy to
12   address them one on one.  But I hope that in the banality of
13   what I've said, I've addressed everything that you've asked
14   for.
15             THE COURT:  No.  You have.  Thank you, sir.
16             MR. SHEEHAN:  Thank you.
17             THE COURT:  Ms. Crockett.
18             MS. CROCKETT:  Thank you, Your Honor.  Thank you for
19   highlighting my argument, which is form over substance.  I
20   appreciate that.
21       Let me start by just saying that, Your Honor, we didn't --
22   we're not trying to suggest to the Court that the search
23   warrant is missing in this case because of the expungement
24   proceedings.  We just knew that there was a way to get behind
25   the clerk file, which was why we asked the Preston County
```

1   Prosecutor's Office to seek those records.  So I don't want the
2   Court to think that we're suggesting to the Court that it's
3   Mr. Seeger's fault we don't have a search warrant.
4            THE COURT:  No.  And I --
5       No.  I would never intuit that or infer that.  And I'm
6   sure it's addressed, but just so it's fresh:  The application
7   was found via the efforts to access the sealed expunged file.
8   Is that correct?
9            MS. CROCKETT:  Your Honor, we actually had in our
10  discovery already the affidavit and complaint for search
11  warrant --
12           THE COURT:  Okay.
13           MS. CROCKETT:  -- and didn't -- none of us --
14           THE COURT:  Okay.
15           MS. CROCKETT:  -- recognized that the search warrant
16  wasn't there until we received a motion to suppress.
17           THE COURT:  Okay.
18           MS. CROCKETT:  So that was how we learned of it.
19      When the State dismissed its case and it bundled up its
20  discovery, it provided it to the FBI as they had it.
21           THE COURT:  Okay.  All right.
22           MS. CROCKETT:  And so we went on a mission to search
23  for the search warrant.
24           THE COURT:  Okay.  So the effort to pierce the seal,
25  for lack of better term, via the expungement statutes was to

 1  try and find the actual warrant itself.

 2          MS. CROCKETT:  That's right.

 3          THE COURT:  Okay.  All right.  Understood.

 4          MS. CROCKETT:  That's right.

 5          THE COURT:  Okay.

 6          MS. CROCKETT:  And the officer, you know, went to his

 7  agency to see if he could get it that way, and he couldn't.  He

 8  couldn't access it from his computer.  The Court heard all the

 9  testimony related to that.  We made those efforts.

10      Okay.  So let me start by agreeing with the Court and

11  agreeing with defense counsel we don't have a document that

12  says "Search Warrant."  We're not disputing that.

13      What we are disputing is whether or not we have a warrant

14  to search.  And the Court heard testimony from Trooper

15  Nicholson that this is the first search warrant he had ever

16  sought in circuit court.  In their efforts, seeing this as a

17  serious case, they sought to go to a court of record.  He

18  didn't understand what a court of record meant.  But

19  regardless, following his detachment commander, that's what he

20  did.

21          THE COURT:  Uh-huh.

22          MS. CROCKETT:  And I think in their efforts to be

23  overzealous in doing things right, now we have a situation

24  where we don't have a search warrant.  That's one scenario.

25      Another scenario is -- is that listening to the testimony

1   of Judge Shaffer, who says it's his practice to always sign
2   both documents and then hand them to the judge -- or hand them
3   to the officer and then take them to the clerk, Trooper
4   Nicholson believed that, while he was waiting for those
5   documents, the search warrant and the affidavit would be part
6   of the packet provided to him.  And he acted believing he had
7   authorization to search.

8        The Court also heard Judge Shaffer say, you know, my
9   signature on that document tells me he had authorization to
10  search.

11            THE COURT:  Right.

12            MS. CROCKETT:  So the question really is:  If we
13  don't have the physical document in our hand, does that mean
14  that the officer is not authorized to search?  And we believe
15  that the document is, again, an example of form over substance.
16  He, in fact, was authorized to search based on the facts of
17  this case as they came out before the Court.

18       I didn't see any cases that suggested to me that if we
19  didn't have the actual warrant in our hand it meant the Court
20  couldn't get to good faith arguments.  And we believe that the
21  Court can find good faith in this case.  We believe that *Leon*
22  is satisfied.  This isn't before 1983, and so the Government
23  does get the benefit of *Leon* if it applies.  And so, you know,
24  the question is whether or not it applies.

25       The exclusionary rule I think is -- is -- it's an

1  extraordinary remedy.  I think it's not to be used in every

2  case.  Suppression is appropriate when, and only when, its

3  substantial social costs are outweighed by the benefits of

4  deterring deliberate, reckless, and grossly negligent

5  misconduct.  And I don't think the Court has that here.  I

6  think Trooper Nicholson testified credibly.

7       You know, does the Government want to stand before the

8  District Court and say we don't have a physical warrant in our

9  hand?  No.  These aren't the ideal facts.  But the fact that we

10 don't have it, I think, doesn't mean that he wasn't authorized

11 to do his search.  I think it is an example -- his testimony

12 was an example that the actions weren't deliberate, that they

13 weren't reckless, they weren't grossly negligent.

14      Also, when a warrant states -- I want to go to a couple of

15 their arguments specifically to the warrant itself.  Assuming

16 the Court accepts my argument that we have a warrant here, then

17 they do have a few challenges to the warrant itself.

18           THE COURT:  Well, let's talk about that before we get

19 into assumptions or hypos.

20      Can the Court infer the existence of a warrant?  Let me

21 start that again.  Is it constitutionally permissible for a

22 Court to infer existence of a warrant based on the record

23 before it?

24           MS. CROCKETT:  Your Honor, I believe that it is under

25 these facts.  What -- so an affidavit -- we heard testimony

 1  about this.  An affidavit sets forth probable cause.  And it

 2  has various elements throughout it.

 3      The warrant mirrors the affidavit.  But what it doesn't --

 4  what the warrant has that the affidavit doesn't have is the

 5  command to search; right?  So we're talking about that one

 6  little sentence that is right next to the judge's signature.

 7      The affidavit also bears the affiant's signature, and it

 8  bears the signature of a neutral and detached magistrate.  And

 9  so in this case -- I was going somewhere else, and I changed

10  my -- my --

11          THE COURT:  Sorry.  My fault.

12          MS. CROCKETT:  -- changed my direction.  So let me

13  just get my bearings.

14      The Court asked me constitutionally.  Because the

15  affidavit has all the information that the search warrant has

16  on it, but it's missing that command language, I argue to the

17  Court that Trooper Nicholson received the command to search.

18      So he takes to Judge Shaffer the affidavit.  He swears it

19  out.  Don't know what the issue is with the search warrant.

20  Because I don't think we can tell the Court specifically what

21  happened with regard to why we don't have a search warrant.

22  But he told Trooper Nicholson, "You're good to go.  Take the

23  documents down to the clerk's office, and you'll get what you

24  receive in order to execute that warrant."

25      And so he received a command --

1              THE COURT:  Mr. Sheehan, I want to make sure there's
2    no dispute.  And I'll take a look at the transcript.  But Judge
3    Shaffer's testimony was he never signs one; he signs either
4    none or both documents.
5              MS. CROCKETT:  That's right.
6              THE COURT:  Is that your recollection?
7              MR. SHEEHAN:  Yes, sir.
8              THE COURT:  Okay.
9              MR. SHEEHAN:  I think it was pattern and practice was
10   his testimony.
11             THE COURT:  Understood.
12             MS. CROCKETT:  That's my recollection as well.
13             THE COURT:  And I realize that merely is a practice,
14   which requires this Court to make inferences therefrom, which
15   was my question.  Can I even do that?
16             MS. CROCKETT:  Right.
17         And Your Honor, I don't know if Trooper Nicholson, you
18   know, believed that that second document would be signed by the
19   Judge and provided to him.  I don't know the -- I don't know
20   what his thought process was on that.  I know that he believed
21   that when he left the courthouse that day he had a search
22   warrant in his hand.  And I know, based on Judge Shaffer's
23   testimony, he authorized Nicholson to search.
24             THE COURT:  Right.
25             MS. CROCKETT:  So I believe he had both -- all of the

1  factors that are laid out in the affidavit for -- affidavit and

2  complaint for search warrant, and he had the command that would

3  have been listed on that warrant itself from Judge Shaffer.

4      The other issues, if the Court will indulge me just a

5  minute --

6          THE COURT:  Uh-huh.

7          MS. CROCKETT:  They raised some issues with regard to

8  nexus.  And the Court heard testimony that -- and the affidavit

9  shows that it was searching the residence at 310 Hilltop Drive

10  near Bruceton Mills in -- within the Northern District of West

11  Virginia in Preston County; that in his experience, you know,

12  devices of this sensitive nature, you know, subjects want to

13  keep it close to them.  They want to keep it private.  And so

14  the residence was where he chose to search.  So that was listed

15  on there.

16      Regarding issues about the credibility of K.S. and whether

17  or not we've reached the threshold where a *Franks* hearing is

18  required.  The Government doesn't believe we've reached the

19  threshold where a *Franks* hearing is required here.  Trooper

20  Nicholson --

21          THE COURT:  Well, I don't believe so either.

22          MS. CROCKETT:  Okay.

23          THE COURT:  I don't think there's a sufficient record

24  before the Court of the substantial showing that *Franks*, and

25  the Fourth Circuit progeny in particular, speak to, to call

 1  into question the veracity or reckless disregard for veracity

 2  in the application, given the record before the Court.  So I

 3  don't think we have a *Franks* issue to talk about.  I don't

 4  think we've unlocked the door to an actual *Franks* analysis or a

 5  *Franks* hearing at this point.  My concern is that there is

 6  simply no warrant.

 7          MS. CROCKETT:  I'm sorry?  There is simply no

 8  warrant?  Yeah.

 9          THE COURT:  But my concern is there simply is no

10  warrant.

11          MS. CROCKETT:  Yeah.  Again, Your Honor, I understand

12  what the Court is saying.  Again, I didn't see any cases that

13  suggested that the absence of the warrant itself, particularly

14  under these facts, meant we couldn't even get to a good faith

15  argument.  I do believe that *Leon* applies if the Court finds

16  that there is no warrant in this case.

17      Regarding overbreadth, because it's another issue that was

18  raised in the motion to suppress, if the Court would just

19  indulge me for a second.  I don't believe that the affidavit,

20  which would have been what was included on a search warrant,

21  has any overbroad language in it.  It does reference nude

22  photographs of minors or juveniles.

23      This is a case that involved a minor sending images of

24  themselves to Mr. Seeger.  So the possibility that he might

25  have printed those images, I don't think it's overbroad to look

1   for images that would constitute CSAM.

2       As far as it relates to all other evidence, I think, of

3   distribution or exhibition of minors engaged in sexually

4   explicit conduct, I don't believe that that provides for, like,

5   general exploratory rummaging of Mr. Seeger's belongings.  The

6   fact that it says "any and all evidence" is qualified by the

7   rest of the sentence which restricts any and all evidence to

8   that evidence of sexually explicit material involving minors.

9   So I think it specifically tailors or narrows the search with

10  regard to that, those devices.

11      Staleness.  I don't recall that being an issue that was

12  raised in the suppression motion.  But Trooper Nicholson,

13  nevertheless, testified, in his experience, individuals who

14  maintain this type of -- this type of material store and save

15  them.  And so I think, you know, even though some time had

16  passed from when she was a minor, the fact that she is

17  disclosing that she is required to send sexually explicit

18  images and videos of herself to Mr. Seeger, there's reason to

19  believe that those images would still be maintained on any

20  devices that were contained in the affidavit.

21      The secondary warrant, Your Honor.  It's -- my practice as

22  a state court prosecutor was that we would do one search

23  warrant that would authorize search and seizure and review of

24  items.  Since I've been in -- you know, in the prosecutor's

25  office here in federal court, it's always been the practice to

1  get a secondary warrant.  And the secondary warrant always is

2  issued in the location where the devices are located at the

3  time you seek the warrant.  And so, in this case, the devices

4  were located in the evidence room in Preston County.  They

5  sought the warrant in Preston County, and then they transported

6  the images where they needed them to be.

7      I've had cases where we get the devices in the location

8  where the devices are located and then we ship them to

9  Pittsburgh or we ship them to Charleston or we ship them

10 somewhere where there's a digital forensic analyst available

11 who can -- who has the time in order to analyze those devices.

12 So I -- you know, we believe that it's -- it's accurate that

13 we -- that that warrant was sought through Preston County.

14     I mean, I think the only -- I think the real issue for the

15 Court is going to be the warrant.

16          THE COURT:  I would concur.

17          MS. CROCKETT:  Yeah.  And again, you know, of course,

18 we wish we had a document in front of the Court and we weren't

19 here, you know, arguing this.  But I don't think that that

20 negates that Trooper Nicholson's reliance in good faith on the

21 fact that he had a warrant was the authorization he had to

22 search Mr. Seeger's residence on March 29th of 2021.

23     Is there any other question the Court might have?

24          THE COURT:  I do not believe so.

25          MS. CROCKETT:  Okay.  Thank you, Your Honor.

1           THE COURT:  Thank you.

2      You get last word, Mr. Sheehan.  Not to make you get up

3  again.

4           MR. SHEEHAN:  No.  I'm good.

5      I'm going to restrict my remarks really to, I think, the

6  Court's focus on the warrant question.

7      When the warrant was executed, there was introduced some

8  body camera footage.  We didn't actually look at it in court,

9  but it's here in evidence.  We would suggest that the Court

10  look at that body cam -- at that footage at the six- and

11  seven-minute marks.  The -- at that point in time, there's some

12  interplay between Mr. Seeger and the officer.  And Mr. Seeger

13  asks if there's a warrant.  The officer has something in his

14  hand.  It is pretty clearly the affidavit.  I can't tell you

15  what's on page 2, but it does look like it's a three-page

16  document, and that affidavit is a three-page document.

17      The officer ends up saying, "I will show it to you at the

18  end."  And I think the inference I would draw is that he didn't

19  have a warrant and he knew he didn't have a warrant and that he

20  was bluffing.

21           THE COURT:  So *Mapp v. Ohio*.

22           MR. SHEEHAN:  Well...

23      And so I will concede, Judge, he doesn't have to have the

24  warrant in his hand.

25           THE COURT:  Right.

1           MR. SHEEHAN:  The warrant could still be back at the

2    ranch.  But I think the warrant has to exist.  And I think

3    that -- and to me that's -- it is a useful piece of inference

4    that draws the in- -- that helps you draw an inference the way

5    that we think it should be drawn and not as the Government is

6    suggesting to you.

7           The -- I will simply comment that Ms. Crockett has

8    suggested that the lack of a command to go do a search is a

9    little detail.  It is certainly in the fine print in the

10   preprinted orders.  I would say it is a crucial part of what,

11   in fact, is a warrant.

12          And I'd also note -- and I think that -- I respect the

13   troopers, and everybody has to start somewhere.  I know I did.

14   But the *Leon* contemplates that we have well-trained police

15   officers.  And if this officer was inadequately trained and

16   didn't understand these basic rules, then I have some problems

17   with this.

18          I would comment on the nude pictures just briefly.  I

19   cited a case that said nude pictures are not enough.  They have

20   to be nude pictures of minors engaged in sexually explicit

21   activity.

22          And with that, I will shut up, Judge, unless you have some

23   questions.

24          All right.  Thank you.

25          THE COURT:  No, sir.  Okay.

1        MS. CROCKETT:  Your Honor, can I just comment briefly

2   on the first comments by defense counsel?

3        THE COURT:  Motion for surreply granted, briefly.

4        MS. CROCKETT:  And Your Honor, that was just that the

5   officer knew that he didn't have the warrant at the time.  He

6   gave you a minute mark to look at at the body-worn camera, and

7   that's because he knew he didn't have a search warrant.

8        Your Honor, Trooper Nicholson was on the stand yesterday,

9   and he could have asked him those questions directly.  And to

10  suggest that to the Court now, I think he's speculating as to

11  why he held those documents.  And speculation isn't necessary.

12  He asked for a copy of the warrant, and Trooper Nicholson told

13  him that he was going to leave him a copy but he was going to

14  hold on to it because he was writing on the property receipt

15  those items that he was seizing.  And then when he left that

16  day, he left Mr. Seeger with a copy of the document.

17       So to suggest that he was bluffing or he was waffling, I

18  just don't think that that's genuine.

19       THE COURT:  You get last word, Mr. Sheehan, if you

20  want it.

21       MR. SHEEHAN:  I think she's fairly presented it, and

22  I think I have as well.  And I think that you can -- you have

23  the hard job.  You have to draw the inferences and you have to

24  make the legal decisions in this particular case.

25       THE COURT:  Understood.  Okay.

1          All right.  We'll keep stewing on that issue.  There was

2     the notice of *Kennedy* evidence.  Is there any objection or

3     anything on that from the defense?

4               MR. DYER:  Your Honor, could I consult with counsel

5     briefly?

6               THE COURT:  You may.  And I'll posit this, because I

7     know the notice is submitted as sort of an alternative.  I --

8          Go ahead.  Go ahead.

9          (Pause in proceedings.)

10              MR. DYER:  We have no objection, Your Honor.

11              THE COURT:  Okay.  All right.  We'll assess that

12    evidence as it comes.  But let's -- let's sort of workshop it

13    in advance.  I know the Government's primary position is that

14    it is intrinsic evidence and, therefore, wouldn't be subject to

15    a 404(b) analysis.

16         Mr. Salem, is this your issue, sir?

17              MR. SALEM:  Yes, Your Honor.

18         So does Your Honor have a copy of the exhibits up there?

19    I can provide additional ones to the Court if --

20              THE COURT:  I do not, handy, but it's --

21              MR. SALEM:  Okay.

22              THE COURT:  -- it's okay.  Just reference them clear

23    enough for the record.  We can --

24              MR. SALEM:  Understood.

25         So we're moving the admission -- or a pretrial ruling on

1    the admission of 13 specific exhibits.  Just to get one out of

2    the way, we had marked Exhibit 2.  Exhibit 2 is three clips

3    taken from what is also marked as Exhibit 1.  We're not going

4    to be using those at this point.

5            THE COURT:  Okay.

6            MR. SALEM:  So Exhibit 2 is out.  We're just simply

7    using the full phone call, which is Exhibit 1.

8        I'll just kind of tick through them as we go.

9        Exhibit 1 is the phone call we heard about between

10   Keith Lee and the defendant from March 22nd of 20- --

11           THE COURT:  Right.

12           MR. SALEM:  -- 2021.  Our argument is that that is

13   intrinsic to the crime.  It's how the whole thing started to

14   begin with.  He also makes a number of statements --

15           THE COURT:  It's how the investigation starts.

16           MR. SALEM:  It --

17           THE COURT:  Not necessarily the crime itself; right?

18           MR. SALEM:  Correct, Your Honor.  It's how the crime

19   itself is discovered, how it comes to light to law enforcement.

20       He makes a number of statements in that that sort of

21   corroborate, to some degree, what the victim in this matter,

22   the original victim, JD2, says to the police; acknowledges the

23   existence of a relationship; and although he doesn't make any

24   admissions regarding underage photographs, certainly does make

25   a number of admissions about other photographs and the

1   existence of the relationship.  And that gets the ball rolling

2   on all of this.

3       We don't really believe -- I mean, my argument would be

4   that there's nothing really prejudicial in it at all.

5   Certainly, he's sort of providing a defense to the charges

6   presented here.  We do believe it's highly relevant because,

7   again, it's how the criminal investigation starts behind this.

8   So we would ask that the Court admit that as *Kennedy* intrinsic

9   evidence.

10      Exhibit 3 --

11      Again, Exhibit 2 we're not moving the admission of.

12      Exhibit 3 -- Exhibits 3 through 13 all deal with items

13  that were taken from the -- I call them "phone dumps" or

14  "computer dumps," the items that were seized in the search

15  warrant.  Two of those resulted in having items of CSAM, and

16  other evidence relevant to the charges here, taken off of them.

17  That was an LG Nexus cell phone and a MacBook Pro that again

18  were seized from his house during the search warrant.

19      Specifically, Exhibit 3.  There's going to be testimony

20  that one of the applications that he used to communicate with

21  his victims and sort of recruit victims is an application

22  called Kik.  It's basically just a variety of messaging apps.

23  The Court may be familiar with it.

24      Found on those devices was a Kik conversation.  This --

25  Exhibit 3 relates specifically to Count Three, which was the

1    solicitation count.  It involves K.S., who is also known as

2    JD2.  These conversations themselves relate specifically to the

3    date in question for Count Three, which are May 26, 2014.

4        In that, he specifically solicits underage photographs.

5    And in it, that is where he also finds out her true age.  This

6    is within, I believe, weeks of them meeting.  She tells him

7    that her birthday is coming up.  He states that he believes

8    that she's going to be turning 18, at that point acknowledging

9    that he knows she's 17.  And further in the conversation she

10   says that she's actually going to be 15 -- or that she's

11   turning 16, acknowledging that she's 15 at that point.

12       His reaction in those conversations is not sort of, "Oh,

13   my goodness.  This isn't right.  We need to stop talking."  At

14   that point in time he then proceeds to -- what he terms as

15   "punish her," requesting nude photographs from her, at that

16   point having learned that she is, in fact, underage.

17       So this is even sort of beyond intrinsic.  It is the crime

18   itself.  It's him actually soliciting CSAM materials from the

19   victim charged in Counts Three and Four.  That is Exhibit

20   Number 3.

21       Exhibit Number 4 is two images of JD2, also known as K.S.

22   In these, we see her.  These are reference to the images

23   requested in Exhibit 3.  These are her sending those images

24   which make up Count Three to the defendant.  In those images we

25   can identify them as such, as referring to Exhibit 3, because

1   he also asks her to write statements on her, including

2   "Steven's slut" on her stomach.  She took photographs of that,

3   sent those to him as requested in Exhibit 3.  Those are

4   Exhibit 4.

5        So, again, intrinsic.  It is the crime itself, the counts

6   involved.

7        Count Five is another item.  It is actually five

8   individual pictures of CSAM materials.  Those are involving

9   P.G., also known as JD Number 1.  These relate to specific

10  requests that he made of her that we will hear.  I'd proffer to

11  the Court there will be testimony from P.G. regarding requests

12  that the defendant made of her, knowing that she was underage,

13  specifically inserting specific objects into herself.

14       This is a theme that plays itself out throughout a number

15  of conversations both with her and with other victims,

16  conversations of which are included in other exhibits.  And I

17  listed them for the Court because it is relevant, because it

18  does repeat over and over again.  But those specific objects

19  that were requested to be inserted included a hairbrush and a

20  marker.  And there are also videos included in some of the

21  accounts -- sorry -- in some of the counts that refer

22  specifically to those objects.  So, again, we're arguing that

23  Exhibit 4 and Exhibit 5 are, in fact, intrinsic.

24       Exhibit 6 is -- refers to Counts One, Two, and Five.  It

25  involves a single image of CSAM involving KD1 [sic]; again,

 1  P.G.  In that, she has "kitten" written on herself.  We're

 2  arguing that this is intrinsic because it relates to Count One

 3  and Two.  It involves the same victim.  Also Count Five,

 4  because that involves possession of CSAM.

 5      Additionally, even if the Court were to find that it was

 6  not intrinsic, it relates to a common scheme throughout many of

 7  these conversations.  And we'll hear testimony from both P.G.

 8  and K.S. that "kitten" was a name that he repeatedly used for

 9  his victims throughout the conversations and throughout the

10  relationships they were involved in with him.  So, again, it

11  shows a common scheme, motivation that he took throughout this.

12      Exhibit 7.  This is where we're moving from more -- we're

13  not so much arguing that this is *Kennedy* evidence, but it's

14  404(b) in that it shows his intent and also commonality of

15  plan.  The reason we're arguing that is because these are

16  different victims not simply charged in the counts.  But they

17  are all from the same general time period, involving victims of

18  the same age, involving the same types of chat platforms,

19  common language.

20      A theme that is seen throughout almost all of the

21  conversations:  The defendant engages in sort of, for lack of a

22  better term, a fantasy with the victims where he terms himself

23  a master and refers to them as slave.  He has them refer to him

24  by name as master throughout these conversations.

25      Exhibit Number 7 involves specifically a female juvenile

1    who -- these happened June through September of 2013; again, in

2    the same time period as charged in the counts.  The counts

3    involve, I believe, a September 2011 into 2014 specifically.

4    And then, obviously, the possession of child pornography on the

5    date of the search warrant, which occurred in 2021.

6         But in these, again, repeatedly, he makes requests that

7    the victim, the person on the other end of the chat, write on

8    their stomach "Property of Steven."  Refers throughout those

9    conversations -- there's talk of master, slave, sort of a

10   subservient-type relationship.

11        Exhibit 8 is a similar chat.  In that, he refers to the

12   subject on the other end, who is Rosie White.  The chat

13   occurred between December of 2012 and January of 2013.

14   Throughout those chats, the victim, although she does not

15   identify herself by age, repeatedly talks about going to

16   school, mentions that she's on winter break at that time,

17   mentions that she's not going to be able to continue talking to

18   him as much because she has to return to school.  She also

19   repeatedly talks about classes that she's engaged in, including

20   algebra two and precalculus, classes that would be associated

21   with a high school age juvenile.

22        There's similar language involved in that.  Again, he

23   repeatedly refers to her as "kitten."  She refers to him as

24   "master."  He repeatedly, again, asks for her to write words on

25   her body, frequently including "Steven's slut."  And again,

1   that goes on for -- throughout December and January.

2       Exhibit Number 9 is a -- three images of CSAM.  They

3   relate to the conversations themselves and also the charged

4   counts in that they are images of juvenile females, also

5   including images of a vibrator and an individual -- what

6   appears to be a juvenile female with writing on their body.

7   Again, it goes under 404(b) to the commonality of plan.  He

8   keeps repeating this over and over again with different

9   victims.

10      Exhibit Number 10 is seven images, some of which are CSAM,

11  some of which are not.  Throughout those images -- actually, in

12  every single image the victims are holding up -- actually, I

13  believe Exhibit 10 is not CSAM.  I apologize.  We are riddled

14  with CSAM throughout this entire thing.  But the Court actually

15  has Exhibit 10.

16          THE COURT:  Uh-huh.

17          MR. SALEM:  Each one of those seven images involves a

18  juvenile subject.  Some of them refer specifically to K.S.,

19  also known as JD2, holding up signs that say "Property of

20  Steven."  Again, these images refer to the commonality of plan.

21      And specifically regarding K.S., which I believe are the

22  last two images.  In those, those refer to a person who was a

23  victim in both Count Three and Four, and also whose CSAM images

24  are included in Count Five, the possession of child pornography

25  count.

1        Exhibit Number 11.  Again, we're moving this.  I believe

2   it is *Kennedy* evidence because it does relate specifically to

3   Count Five.  It involves a mix of three CSAM images and four

4   non-CSAM images, again, with writing on the body.  Some of

5   these individuals were identified; some were not able to be

6   identified.  Again, though, it shows a commonality of plan,

7   same modus operandi over and over again.

8        That brings us to Exhibit Number 12, which is Kik messages

9   from -- these are from May of 2014, again relating specifically

10  to the same time frame that he's communicating with both P.G.

11  and K.S.  It shows again what his intent was at the time,

12  specifically, with these.  Because in these messages he's

13  speaking to underage girls.  In one of them, actually, I

14  believe --

15       Is it all right if I bring this up for the Court, Your

16  Honor?  Because I do think this one is important.

17       Are we able to bring up pages 6 through 9?  Or start with

18  page 6 of Exhibit Number 12.

19       And Your Honor, throughout this conversation he's

20  communicating with a female.  She refers to him as master.  She

21  brings up the fact that her birthday --

22       And can we scroll to the bottom of the page?  Is this

23  Exhibit Number 12?  Could you go to the next page?

24       And we have at the bottom --

25       Keep going down a little bit.

1        -- "Are you all right, master?"

2        He asks, "Why do you ask?"

3        "Just asking how you are, master.  You seem" -- "You seem

4   tense."

5        He replies, "Because you are 17."

6        She says, "Yes, I am, master."

7        "Your Twitter says you turn 15 on Saturday."

8        "I was afraid when you found out I was 15 you would stop

9   talking to me, master."

10       "I just" -- "I'm more concerned about the lying."

11       "I just lied about my age, I swear.  I know you probably

12  won't believe me now, master."

13       He refers to her as a "stupid slut."

14       She replies, "Yes, master."

15       He says, then, "Write what I said earlier on your

16  stomach."

17       "Yes, master."

18       "Show me.  I guess you got busy or don't want to take your

19  punishment for lying."

20       So, again, this specifically shows what his intent was at

21  the time.  He's clearly aware of the underage status of the

22  girls that he's talking to.  He continues to solicit

23  photographs of the nature which we see throughout the other

24  exhibits, where he's having them write on their body, having

25  them send CSAM images to him over and over again.

1    Exhibit 13 is a similar email interaction with a female by

2    the name of Reni Moore.  At that time he asks her specifically

3    whether or not she has ever, his term, "sucked a dick."  She

4    says no, and he asks why not.  She says, "Because I'm 14 years

5    old."  He then proceeds throughout that conversation to solicit

6    her to engage in sex acts with him.  So, again, all of these go

7    specifically to intent.

8    We do anticipate that based on Exhibit 1 and also

9    statements made throughout the body-worn camera -- the

10   defendant repeatedly states that he was not aware of the age of

11   the actual victims in this: K.S.  Obviously, he was not aware

12   of the allegations at that time involving P.G.  But it does --

13   we, as an element of these offenses, have to show that he had

14   reason to believe or in fact believed that the individuals he

15   was receiving pictures of and engaging with in these actions

16   were under the age of 18.  And again, these are on point and

17   show directly his intent and what his belief was in relation to

18   that.

19   The final exhibit, Exhibit Number 14, is a CSAM image of a

20   third identified underage female.  It goes directly to Count

21   Five because, again, it is a CSAM image that was in his

22   possession, another identifiable victim that Agent Ryan was

23   able to establish the age and identity of.

24   In terms of all of these, as I stated, we believe there is

25   a valid reason for the admission of each of them under 404(b).

1          In terms of the 403 balancing that the Court has to
2     perform on top of that, each of them is highly relevant.  We
3     don't believe that the prejudicial value substantially
4     outweighs the probative value under the rule.  And we would ask
5     that the Court admit them in regards to this matter.
6                    THE COURT:  Understood.  Thank you, counsel.
7                    MR. SALEM:  Thank you, Your Honor.
8                    THE COURT:  And no objection, Mr. Dyer?
9                    MR. DYER:  Not at this time, Your Honor.  No, sir.
10                   THE COURT:  Okay.  Understood.
11         The Court would grant the motion.  We'll treat it as a
12    motion.  I do believe the exhibits Mr. Salem identified are
13    intrinsic to the crimes charged in the indictment and,
14    therefore, are admissible under *U.S. v. Kennedy* and its
15    progeny.  Moreover, Rule 404(b) would also provide for their
16    admission for the reasons Mr. Salem stated.  The Court would
17    find that Rule 403 does not preclude admission under either
18    theory.
19         That is a pretrial ruling at this point.  If there is an
20    objection as trial develops, counsel, note it, and we can
21    revisit it on a case-by-case; or if there's a categorial or
22    broader objection, we can do it then.
23                   MR. DYER:  Understood, Your Honor.  Thank you.
24                   THE COURT:  Okay.  All right.  Any other motions we
25    need to talk about pretrial?

1            MR. SALEM:  Not so much a motion, Your Honor, but we
2    did provide notice of our intent to introduce the contents of
3    both the LG Nexus cell phone and the MacBook --
4            THE COURT:  Right.
5            MR. SALEM:  -- as self-authenticating under 902(11)
6    and (14).  There hasn't been an objection filed to that notice.
7    I just wanted to make sure that we were all on the same page,
8    because we don't plan to call the forensic examiner.  So...
9            MR. SHEEHAN:  That's fine, Judge.  That's fine.
10           THE COURT:  Okay.  All right.  Without objection, we
11   would anticipate receiving that evidence, assuming other
12   predicates are established and satisfied.
13       Okay.  Any other motions -- obviously, other than the
14   suppression motion -- from the defense --
15           MR. DYER:  None from the defense, Your Honor.
16           THE COURT:  -- that you're aware of at this point?
17   Okay.
18           MR. DYER:  No.  No, sir.
19           THE COURT:  Okay.  We will get counsel, in
20   anticipation of next week, the Court's planned voir dire and
21   our current, initial state of the charge - jury instructions,
22   the charge.  We will convene, as is my usual practice, at 9:00
23   on Tuesday, the 22nd, upstairs in the magistrate courtroom to
24   review the Court's planned voir dire and talk through it and
25   also take up any other matters that we may need to address

1   before we come downstairs for jury selection.

2       I know everyone has -- most everybody has been here for a

3   trial.  I'll just -- I'll mention it next Tuesday morning.

4   I'll mention it here as well today.  Of course, all of our

5   prospective jurors will be here in the courtroom when we come

6   downstairs from the third floor magistrate courtroom to here.

7   Just be mindful of that as you come into the courtroom, that it

8   will be full of our prospective jurors.

9       The Court, of course, will conduct voir dire, and we'll go

10  from there.

11      If that process goes efficiently, then there is a prospect

12  we would get to opening statements before lunch.  I mention

13  that just for counsel's planning purposes; that we -- if we

14  have time, we would proceed directly to that.

15      One other just sort of logistical nightmare that is

16  inherent to our space here.  To the extent we need to have

17  individual voir dire with a prospective juror, we would most

18  likely go back into the jury suite to do that.  The space and

19  acoustics here at the bench are so poor that if you're more

20  than one person removed from the speaker, you can't -- you

21  can't hear.  And so, largely, what we've been doing is going

22  back to the jury suite to take up any individual follow-up or

23  responses or questions of a more private and confidential

24  nature.

25      I'll ask counsel Tuesday morning how long you request for

 1   an opening statement.  I've learned some hard lessons.  They're

 2   now treated as requests.  I don't think I've denied a request

 3   yet since I transformed that process into a request for a time

 4   allotment, reserving the right to do so.

 5       If, as the trial progresses, we make revisions to our jury

 6   charge, you will continue to receive updates during the course

 7   of the trial.

 8       Other logistical things:  Depending on the composition of

 9   our jury, we usually start at 9:30.  As everyone knows, we draw

10   from a pretty vast geographic area for our jurors.  And if we

11   have folks coming from further points, I hate to inconvenience

12   their day by trying to start earlier.  We'll take that by ear.

13       Along the same lines, we'll run to somewhere between 4:30

14   and 5:00 every day, when we find a good spot to break, to

15   maximize out our time with our jurors.  But also, given folks

16   may have commutes of significance, I do hate to keep them here

17   too-too late.

18       I would ask counsel, of course, be in communication

19   throughout trial about expected witnesses, scheduling of those

20   witnesses, and the rest.  If there are any scheduling issues or

21   scheduling predicaments, please let us know, too, so we can be

22   prepared to deal with that as well.

23       Any sort of trial management or logistical questions from

24   the Government?

25              MS. CROCKETT:  Yes, Your Honor.  Last time I appeared

1  before the Court in a similar case, the Court required to see

2  the CSAM images before trial.  I don't know if the Court is

3  making that same request, but we do have -- we have the images

4  with us.

5            THE COURT:  Not -- in that case there was evidentiary

6  issues we needed to take up on this front.  At this point, no.

7            MS. CROCKETT:  Okay.  How we handle the CSAM, Your

8  Honor.  I'm assuming that what we will do is we will, you know,

9  admit the images through individuals, but we will actually not

10  provide it to the clerk.  We will maintain it on a thumb drive

11  that will continue to be locked up throughout the case; if

12  there's a conviction, throughout appeal.  But it's my

13  understanding that we will maintain those images for the clerk.

14     Is that right?

15            THE COURT:  Any objection to that process and

16  procedure?

17            MR. SHEEHAN:  No, Judge.  I think that's great

18  procedure.

19            THE COURT:  Yeah.  We will follow that practice,

20  Ms. Crockett, yes.

21            MS. CROCKETT:  Okay.  And Your Honor, it would be my

22  preference to maintain all those images on one thumb drive so

23  that we don't have a lot of thumb drives --

24            THE COURT:  Might as well.

25            MS. CROCKETT:  Okay.

1          THE COURT:  Yes, might as well.

2          MS. CROCKETT:  Your Honor, I don't know if it's your

3     practice to ask if any pleas have been offered.  There was a

4     plea offered that was not accepted.  And then there was a

5     request for a conditional plea that expires at the close of

6     evidence on the suppression issue.  So just making the Court

7     aware of that.

8          THE COURT:  We'll get there.  Thank you, ma'am.

9          MS. CROCKETT:  Thank you.

10         THE COURT:  All right.  Any management or logistical

11    questions or issues from the defense?

12         MR. DYER:  Your Honor, actually, my understanding was

13    that the -- the opportunity to accept the conditional plea was

14    going to expire upon the rendering of a decision by the Court.

15    And hence, my question was going to be:  Does the Court have

16    any anticipation at this point at all as to when it -- that

17    decision may be rendered?  I mean --

18         THE COURT:  It is at the top of our priority list.

19    So we will work on that.  Could be as soon as today, but I

20    would anticipate tomorrow at the latest.

21         MR. DYER:  Thank you, Your Honor.

22         THE COURT:  If that changes as we continue our work,

23    we will let counsel know.

24         MR. DYER:  Understood.

25         THE COURT:  Yeah.  Okay.

1          MR. DYER:  Thank you.

2          THE COURT:  Any disclosures still outstanding from

3   the Government?  Discovery?  *Brady?*  *Jencks*?  *Giglio*?  Anything

4   at all?

5          MS. CROCKETT:  No, Your Honor.

6          THE COURT:  Okay.  Anything, counsel, you're aware of

7   that's not been provided?

8          MR. DYER:  I don't believe so, Your Honor, no.

9          MS. CROCKETT:  And Your Honor, if I could just

10  qualify that answer just for the record.  Much of the evidence

11  in this case isn't evidence that we could just turn over to the

12  defense.  So what we did was we made --

13         THE COURT:  Made it available?

14         MS. CROCKETT:  Yes.

15         THE COURT:  Okay.  That --

16         MS. CROCKETT:  And met with them on several occasions

17  for them to review the devices in their entirety.

18         THE COURT:  No.  Understood.  Understood.  Just

19  making --

20         MR. DYER:  Yeah.  They've been very forthcoming with

21  disclosure of the evidence.  I'll agree.

22         THE COURT:  Understood.  Okay.  Thank you.  Just

23  making sure there weren't any loose ends.

24     Okay.  Mr. Seeger, sir, can I ask you to stand so that

25  Madam Clerk can swear you in.  Thank you so much.

1      (Defendant sworn.)

2              THE CLERK:  Thank you.

3              THE COURT:  Thank you, sir.  You can take your seat,

4    Mr. Seeger.

5        Obviously, sir, you've been sworn in, so you are under

6    oath.  I do just have a couple questions for you.  But because

7    you're under oath, please keep in mind any false statements you

8    may make or false answers you give in response to any of my

9    questions, those can form the basis of a separate criminal

10   action against you for false swearing or for perjury.

11       Do you understand that, sir?

12             THE DEFENDANT:  Yes, sir.

13             THE COURT:  All right.  If I ask a question or say

14   anything at all or for any other reason that prompts you to

15   want to have a conversation with your counsel, just let either

16   of those gentlemen know or let me know, and we'll take a break

17   so you-all can talk.

18       Do you understand that?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  Okay.  My questions, sir, are about the

21   plea agreements that have been tendered to you.  I do not want

22   you, however, Mr. Seeger, to tell me about any of the

23   conversations you've had with either or both of your lawyers.

24   None of my questions are meant to get at substantive

25   conversations you've had with your lawyers.  No one, including

1  me, has a right to know anything that you and your lawyers have

2  talked about.  Those conversations and communications are

3  protected by the attorney-client privilege.  So I don't want

4  you to assume that I'm asking you a question that you need to

5  tell me about conversations you're had with your counsel.

6      Do you understand that, sir?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  Okay.  The Government indicates they've

9  made two different plea proposals to you.  Have you been made

10  aware of both of those plea proposals, sir?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Okay.  And do you believe you've had --

13  up to now, anyway -- sufficient time to not only review those

14  plea proposals, but discuss them thoroughly with your counsel?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Okay.  Thank you so much, sir.

17      Anything else, Mr. Sheehan or Mr. Dyer, you believe I need

18  to cover with Mr. Seeger?

19          MR. SHEEHAN:  Not prior to trial, Judge, no.

20          THE COURT:  Okay.  All right.  Understood.

21      All right.  Anything else, then, from the Government at

22  this point?

23          MS. CROCKETT:  No, Your Honor.

24          THE COURT:  Okay.  From the defense?

25          MR. DYER:  Your Honor, I don't --

```
 1              THE COURT:  Yes, sir.
 2              MR. DYER:  I don't want to create an issue where
 3    there is none.  But I didn't detect any response, verbally or
 4    nonverbally, from Ms. Crockett when I brought to the Court's
 5    attention that defense's understanding is that this plea offer,
 6    this most recent conditional plea offer which would preserve
 7    unto the defendant the right to appeal any adverse decision of
 8    the suppression issue, was going to remain available up until
 9    the point that the decision was made.  And I just want to be
10    clear about that.  Because, I mean, it's rather meaningless
11    otherwise.  I mean, we -- and that's what Mr. Seeger has
12    anticipated.  And frankly, that's what we'd told him that would
13    be the -- you know, the anticipation of that agreement.
14        Is there an issue?  I mean, that's -- is that going to be
15    an issue?
16              MS. CROCKETT:  I don't believe it's going to be an
17    issue, Your Honor.
18              THE COURT:  Well, I --
19              MS. CROCKETT:  I said --
20              THE COURT:  I'm not going to get involved in the --
21              MS. CROCKETT:  Okay.
22              THE COURT:  -- plea negotiations and discussions,
23    obviously.
24              MR. DYER:  Right.
25              THE COURT:  I'll leave that to your-all's
```

1    conversations --

2              MS. CROCKETT:  Thank you.

3              THE COURT:  -- after we recess here this morning.

4              MS. CROCKETT:  Thank you, Your Honor.

5              MR. DYER:  That will be fine.

6              THE COURT:  That's probably an overly cautious

7    approach to that issue, but it's mine so far.  Okay.

8              MR. DYER:  Understood.

9              THE COURT:  I'll leave that to you-all.  All right?

10             MR. DYER:  Understood.

11             THE COURT:  We will continue our work on the motion

12   to suppress.  I realize where we are in terms of trial prep,

13   trial calendar, possible plea discussions, and all that.  It is

14   top priority.  I would anticipate tomorrow.  And if that

15   changes at all, we'll keep counsel posted.  Okay.

16             MR. DYER:  Thank you, Your Honor.

17             THE COURT:  All right.  We'll stand adjourned until

18   further order of the Court.  Thank you all.

19        (Proceedings concluded at 11:20 AM.)

20

21

22

23

24

25

1                          CERTIFICATE

2

3        I, Rachel Kocher, a Registered Merit Reporter and Official

4    Reporter of the United States District Court for the Northern

5    District of West Virginia, do hereby certify that the foregoing

6    is a true and correct transcript of the proceedings had in the

7    above-styled action as reported by me stenographically, all to

8    the best of my skill and ability.

9        I certify that the transcript fees and format comply with

10   those prescribed by the Court and the Judicial Conference of

11   the United States.

12       Given under my hand this 6th day of June 2025.

13

14

15                              *Rachel Kocher*
                             _____
16                           Rachel Kocher, RMR, CRR

17

18

19

20

21

22

23

24

25